109 T.C. No. 22

UNITED STATES TAX COURT

DUDLEY B. AND LA DONNA K. MERKEL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

DAVID A. AND NANCY J. HEPBURN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 10031-95, 10032-95.     Filed December 30, 1997.

Ps realized income on account of the discharge of
indebtedness.  Ps excluded that income pursuant to the
insolvency exclusion of sec. 108(a)(1)(B), I.R.C., by
including certain "contingent" liabilities in the
insolvency calculation of sec. 108(d)(3), I.R.C.
    <u>Held</u>:  The term "liabilities" in sec. 108(d)(3),
I.R.C., requires Ps to prove with respect to any
obligation claimed to be a liability that Ps will be
called upon to pay that obligation in the amount
claimed.  <u>Held</u>, <u>further</u>, Ps failed to prove that they
would be called upon to pay any amount with respect to
either of the obligations claimed to be liabilities.
<u>Held</u>, <u>further</u>, Ps failed to prove that, on the
measurement date, their liabilities exceeded the fair
market value of their assets and, therefore, may not
exclude any income under sec. 108(a)(1)(B), I.R.C.

Gregory W. MacNabb, for petitioners.

Ann M. Welhaf, for respondent.


HALPERN, Judge:  In these consolidated cases, respondent determined deficiencies in the Federal income tax of petitioners Dudley and La Donna Merkel and David and Nancy Hepburn for their 1991 taxable (calendar) years in the amounts of $115,420 and $116,347, respectively.  Both cases involve similar circumstances and require us to determine whether petitioners in the two cases (the Merkels and the Hepburns, respectively) may exclude under section 108(a)(1)(B) certain income from the discharge of indebtedness.  Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

                         FINDINGS OF FACT

     Some of the facts have been stipulated and are so found. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference.

     At the time the petitions were filed, the Merkels and the Hepburns resided in Scottsdale and Paradise Valley, Arizona, respectively.

Discharge of Indebtedness Income

     During 1991, the Merkels and the Hepburns were all partners in a partnership (the partnership) that, on September 1, 1991,

realized income on account of the discharge of indebtedness. On their 1991 U.S. Individual Income Tax Returns (Forms 1040; filing status of married filing joint return), the Merkels and the Hepburns each (couple) disclosed their distributive share of that income, $359,721, but excluded such amount from gross income on the ground that each was insolvent immediately before that income was realized by the partnership.

The SLC Indebtedness

Systems Leasing Corp. (SLC) is an Arizona corporation organized in 1979 by petitioners Dudley Merkel and David Hepburn to engage in the computer leasing business. SLC is owned "50/50" by Dudley Merkel and David Hepburn. Dudley Merkel and David Hepburn were officers of SLC during its fiscal years ended February 29, 1992, and February 28, 1993, and received officer compensation for those years as follows:

|  | FYE 2/29/92 | FYE 2/28/93 |
| --- | --- | --- |
| Dudley Merkel | $183,202 | $191,150 |
| David Hepburn | 182,824 | 191,151 |

In 1986, SLC incurred an indebtedness to Security Pacific Bank (the indebtedness and the bank, respectively), evidenced by a note (the SLC note). The SLC note was personally guaranteed by each petitioner (collectively, petitioners' guarantees). As of April 16, 1991, the unpaid balance of the SLC note was in excess of $3,100,000, and SLC was in default of its obligations under the SLC note.

On May 31, 1991, SLC, the bank, and petitioners, as guarantors, entered into an agreement (the agreement) containing the terms and conditions of a structured workout concerning the repayment of the indebtedness to the bank. The agreement, in part, provides as follows:

(1) SLC is to pay to the bank $1,100,000 (the payoff) on or before August 2, 1991 (the settlement date);

(2) the bank will release its security interest in the remaining collateral upon payment of the payoff by the settlement date; and

(3) after the payoff by the settlement date, the bank will refrain from exercising any remedies under the SLC note or petitioners' guarantees if bankruptcy is not filed by or for SLC or petitioners, among others, voluntarily or involuntarily, within 400 days after the settlement date.

SLC made the payoff by the settlement date, and the bank released its security interests in the remaining collateral of SLC. The other conditions of the agreement were met, and the bank, at the expiration of the 400-day period, released SLC from its liability as maker of the SLC note and petitioners from petitioners' guarantees.

At no time did the bank make any formal written request or formal written demand for payment from petitioners pursuant to petitioners' guarantees.

North Carolina's Sales and Use Tax

SLC was engaged in the business of leasing computer systems in the State of North Carolina during the relevant period.  The North Carolina Department of Revenue (the Department of Revenue) issued a "Notice of Sales and Use Tax Due" (the notice) to SLC dated June 14, 1991.  The notice identifies the amount of taxes, penalties, and interest due, a total of $980,511.84, and states that the assessment is final and conclusive.  The assessment of sales and use tax identified in the notice was for taxes that were never collected by SLC.  After receipt of the notice, SLC's recourse was to pay the assessed amount and file a suit for refund or to protest the assessment if the Department of Revenue, in the exercise of its discretion, permitted additional time to file a protest.  As of August 31, 1991, SLC had not paid the amount identified as due on the notice, nor had SLC requested time to file a protest.

On October 14, 1991, petitioners engaged an attorney to protest the sales and use tax assessment.  The Department of Revenue granted SLC 60 days to file a protest.  As a result of that protest, the Department of Revenue abated the assessment against SLC in full.

The Department of Revenue never proposed nor made an assessment against any of petitioners relating to the sales and use tax assessed against SLC.

OPINION

I.  Introduction

   A.  Issue

The issue in these consolidated cases is whether petitioners were insolvent on August 31, 1991 (the measurement date), for purposes of section 108(a)(1)(B) (the insolvency issue).  There is no question that, if section 108(a)(1)(B) (the insolvency exclusion) does not apply to petitioners, $359,721 would be included in the gross income of each of the Merkels and the Hepburns for 1991 as each couple's distributive share of certain discharge of indebtedness income realized by a partnership in which both couples were partners.  The parties have stipulated that resolution of the insolvency issue depends on whether petitioners may include in the insolvency calculation provided in section 108(d)(3) (the statutory insolvency calculation) either of the following obligations:  (1) "the liability of each of the petitioners as guarantors of the loan made by Security Pacific Bank to SLC" (petitioners' guarantees) and (2) "the personal liability, if any, of petitioners Dudley Merkel and David Hepburn as officers of SLC for unpaid sales and use taxes assessed by the State of North Carolina against SLC" (the assessment against SLC shall be referred to as the State tax assessment and the personal liability, if any, of petitioners with respect to the State tax assessment shall be referred to as the State tax exposure).  In

addition, the parties have stipulated that the "exposure of each of petitioners Merkel and Hepburn" pursuant to petitioners' guarantees and the State tax exposure was $1 million and $490,000, respectively, and, "if the petitioners properly may include the amount of their exposure under either * * *, the petitioners were each insolvent to the extent of the full amount of the * * * discharge of indebtedness income to each." Petitioners bear the burden of proof on all questions of fact. Rule 142(a).

B.  Arguments of the Parties

Respondent argues that the term "liabilities", as used in section 108(d)(3), "must be given its plain meaning" and encompasses "only liabilities ripe and in existence on the measurement date".  Respondent would have the Court find that petitioners' guarantees were contingent liabilities and, thus, not liabilities in existence on the measurement date for purposes of section 108(d)(3).  Respondent would have the Court also find that, as of the measurement date, the State tax exposure was not a liability for purposes of section 108(d)(3), contingent or otherwise.

Petitioners argue that the plain meaning of the term "liabilities" in section 108(d)(3) "includes all liabilities, whether contingent or otherwise", and "whether and how much of a liability is counted must be determined on a liability-by-

liability basis with due regard to all of the circumstances that existed" at the time insolvency is to be determined.  With respect to contingent liabilities, petitioners concede:  (1) "the likelihood of the occurrence of the contingency * * * [may be] so remote as not to give rise to a liability" and (2) "a contingent liability may be a liability; however, the amount of that liability may be less than the amount of full exposure."  Petitioners would have the Court find that both petitioners' guarantees and the State tax exposure were liabilities in existence on the measurement date, to be taken into account (perhaps at "less than the amount of full exposure") under section 108(d)(3).

## II.  Analysis

### A.  The Code

Section 61(a)(12) provides that gross income means all income from whatever source derived, including income from discharge of indebtedness.  In certain circumstances, however, income from discharge of indebtedness is excluded from gross income.  In relevant part, section 108(a) provides:

> (1) In general.--Gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if--
>
>> (A) the discharge occurs in a title 11 case,
>>
>> (B) the discharge occurs when the taxpayer is insolvent * * *

\* \* \* \* \* \* \*

(3) Insolvency exclusion limited to amount of insolvency.--In the case of a discharge to which paragraph (1)(B) applies, the amount excluded under paragraph (1)(B) shall not exceed the amount by which the taxpayer is insolvent.

The term "insolvent" is defined in section 108(d)(3) as follows:

For purposes of this section, the term "insolvent" means the excess of liabilities over the fair market value of assets. With respect to any discharge, whether or not the taxpayer is insolvent, and the amount by which the taxpayer is insolvent, shall be determined on the basis of the taxpayer's assets and liabilities immediately before the discharge.

Section 108 contains no definition of the term "liabilities", nor does the Code contain any generally applicable definition of that term. The regulations interpreting section 108 neither add to the statutory definition of insolvency nor define the term "liabilities".

Section 108(e)(1) states that, except as provided in section 108, "there shall be no insolvency exception from the general rule that gross income includes income from the discharge of indebtedness."

B.  Extrinsic Sources

1.  Introduction

This Court's function in the interpretation of the Code is to construe the statutory language so as to give effect to the intent of Congress. See United States v. American Trucking Associations, 310 U.S. 534, 542 (1940); Fehlhaber v.

<u>Commissioner</u>, 94 T.C. 863, 865 (1990), affd. 954 F.2d 653 (11th Cir. 1992); <u>U.S. Padding Corp. v. Commissioner</u>, 88 T.C. 177, 184 (1987), affd. 865 F.2d 750 (6th Cir. 1989).  Where the statute is ambiguous, it is well established that we may look to its legislative history and to the reason for its enactment.  See <u>United States v. American Trucking Associations</u>, <u>supra</u> at 543- 544; <u>Centel Communications Co. v. Commissioner</u>, 92 T.C. 612, 628 (1989), affd. 920 F.2d 1335 (7th Cir. 1990); <u>U.S. Padding Corp. v. Commissioner</u>, <u>supra</u> at 184.

In the context of the parties' dispute, we believe that the term "liabilities" in section 108(d)(3) is ambiguous, in particular as to the nature of the examination to be afforded to obligations claimed to be liabilities for purposes of the statutory insolvency calculation.[1]  Therefore, this Court shall examine the legislative purpose of the insolvency exclusion and its related provisions.

## 2.  Legislative History

The insolvency exclusion was added to the Code by the Bankruptcy Tax Act of 1980 (the Bankruptcy Tax Act), Pub. L. 96- 589, sec. 2(a), 94 Stat. 3389-3392.  In the Bankruptcy Tax Act, which was enacted 2 years after Congress revised and modernized

---

[1]    Previous cases provide only limited guidance in resolving the question presented in this case.  See, e.g., <u>Correra v. Commissioner</u>, T.C. Memo. 1997-356; <u>Ng v. Commissioner</u>, T.C. Memo. 1997-248; <u>Caton v. Commissioner</u>, T.C. Memo. 1995-80; <u>Traci v. Commissioner</u>, T.C. Memo. 1992-708; <u>Bressi v. Commissioner</u>, T.C. Memo. 1991-651, affd. without published opinion 989 F.2d 486 (3d Cir. 1993).

the bankruptcy law, Pub. L. 95-598, 92 Stat. 2549, Congress "intended to complete the process of revising and updating Federal bankruptcy laws by providing rules governing the tax aspects of bankruptcy and related tax issues." Staff of Joint Comm. on Taxation, Description of H.R. 5043 (Bankruptcy Tax Act of 1980) as Passed the House, at 3 (J. Comm. Print 1980).

The relevant committee reports (the committee reports) accompanying H.R. 5043, 96th Cong., 2d Sess. (1980), which became the Bankruptcy Tax Act, provide that the proposed insolvency exclusion is intended to insure that an insolvent debtor outside of bankruptcy (like a debtor coming out of bankruptcy, who is accorded a "fresh start" under the bankruptcy law) is not burdened with an immediate tax liability. See S. Rept. 96-1035, at 10 (1980), 1980-2 C.B. 620, 624; H. Rept. 96-833, at 9 (1980). The pre-existing law is described as follows:

> Under a judicially developed "insolvency exception," no income arises from discharge of indebtedness if the debtor is insolvent both before and after the transaction;[1] and if the transaction leaves the debtor with assets whose value exceeds remaining liabilities, income is realized only to the extent of the excess.[2]
> * * *
>
> [1]Treas. Regs. § 1[.]61-12(b)(1); Dallas Transfer & Terminal Warehouse Co. v. Comm'r, 70 F.2d 95 (5th Cir. 1934).
> [2]Lakeland Grocery Co., 36 B.T.A. 289 (1937).

S. Rept. 96-1035, supra, 1980-2 C.B. at 623; see H. Rept. 96-833, supra at 7. The proposed insolvency exclusion is described in terms that reflect the preexisting insolvency exception:

The bill provides that if a discharge of indebtedness occurs when the taxpayer is insolvent (but is not in a bankruptcy case), the amount of debt discharge is to be excluded from gross income up to the amount by which the taxpayer is insolvent.[16]

[16]The bill defines "insolvent" as the excess of liabilities over the fair market value of assets, determined with respect to the taxpayer's assets and liabilities immediately before the debt discharge. The bill provides that except pursuant to section 108(a)(1)(B) of the Code (as added by the bill), there is to be no insolvency exception from the general rule that gross income includes income from discharge of indebtedness.

S. Rept. 96-1035, supra, 1980-2 C.B. at 627; see H. Rept. 96-833, supra at 12.

3. Relevant Cases Cited in the Committee Reports

The Supreme Court in United States v. Kirby Lumber Co., 284 U.S. 1 (1931), established the general rule that a debtor realizes income when discharged of indebtedness (i.e., relieved of indebtedness without full payment of the amount owed). In that case, the taxpayer repurchased some of its own bonds in the open market for $137,521[2] less than what it had received upon issuance earlier that same year. Justice Holmes distinguished Bowers v. Kerbaugh-Empire Co., 271 U.S. 170 (1926), the Supreme Court's first pronouncement on the subject of income from the discharge of indebtedness, by stating:

the defendant in error [in Kerbaugh-Empire] owned the stock of another company that had borrowed money repayable in marks or their equivalent for an enterprise that failed. At the time of payment the

---

[2] For convenience, amounts have been rounded to the nearest dollar.

marks had fallen in value, which so far as it went was a gain for the defendant in error, and it was contended by the plaintiff in error that the gain was taxable income. But the transaction as a whole was a loss, and the contention was denied. Here there was no shrinkage of assets and the taxpayer made a clear gain. As a result of its dealings it made available $137,521.30 assets previously offset by the obligation of bonds now extinct. We see nothing to be gained by the discussion of judicial definitions. The defendant in error has realized within the year an accession to income * * * . [United States v. Kirby Lumber Co., 284 U.S. 1, 3 (1931).]

In Dallas Transfer & Terminal Warehouse Co. v. Commissioner, 70 F.2d 95 (5th Cir. 1934), revg. 27 B.T.A. 651 (1933), the taxpayer was relieved of an indebtedness with respect to unpaid rent and interest thereon of $107,881 upon conveying to the lessor certain real property of lesser value. The Court of Appeals for the Fifth Circuit held that the transaction did not give rise to taxable income because the taxpayer remained insolvent[3] after the discharge of its debt to the lessor and distinguished United States v. Kirby Lumber Co., supra, as follows:

The taxpayer's [Kirby Lumber Co.'s] assets having been increased by the cash received for the bonds, by the repurchase of some of those bonds at less than par the taxpayer, to the extent of the difference between what it received for those bonds and what it paid in repurchasing them, had an asset which had ceased to be offset by any liability, with a result that after that transaction the taxpayer had greater assets than it had before. The decision * * * that the increase in clear assets so brought about constituted taxable income is

_____

[3] The Board of Tax Appeals, however, noted that the taxpayer was solvent after the discharge. See Dallas Transfer & Terminal Warehouse Co. v. Commissioner, 27 B.T.A. 651, 657 (1933), revd. 70 F.2d 95 (5th Cir. 1934).

not applicable to the facts of the instant case, as the cancellation of the respondent's past due debt to its lessor did not have the effect of making the respondent's assets greater than they were before that transaction occurred. * * * [Dallas Transfer & Terminal Warehouse Co. v. Commissioner, supra at 96.]

In Lakeland Grocery Co. v. Commissioner, 36 B.T.A. 289 (1937), the taxpayer, pursuant to a "composition settlement", paid to its creditors $15,473 in consideration of being relieved of the taxpayer's indebtedness to those creditors of $104,710. Prior to the composition settlement, the taxpayer was insolvent; after that settlement, the taxpayer had net assets of $39,597. The Board of Tax Appeals (the Board) agreed with the Commissioner

> that the rationale of United States v. Kirby Lumber Co., 284 U.S. 1, should apply and that gain is realized to the extent of the value of the assets freed from the claims of creditors * * * The petitioner's net assets were increased from zero to $39,596.93 as a result of the cancellation of indebtedness by its creditors, and to that extent it had assets which ceased to be offset by any liability. * * * [Id. at 292.]

C. Discussion

   1. Origin of the Net Assets Test

The Board's approach to a taxpayer in financial distress being discharged of an indebtedness, which approach was crystallized in Lakeland Grocery Co. v. Commissioner, supra, has been called, among other things, the "net assets" test.[4] That

---

[4] See Surrey, "The Revenue Act of 1939 and the Income Tax Treatment of Cancellation of Indebtedness", 49 Yale L. J. 1153, 1164 (1940); Warren & Sugarman, "Cancellation of Indebtedness and Its Tax Consequences: I", 40 Colum. L. Rev. 1326, 1352 & n.108 (1940) ("The `net assets' test was first intimated in Porte F. Quinn, 31 B.T.A. 142, 145 (1934)."); see also Bittker & Thompson,
(continued...)

test is based on the so-called "freeing-of-assets" theory derived from the Supreme Court's statement in <u>Kirby Lumber</u> that the transaction "made available $137,521.30 assets previously offset by the obligation of bonds now extinct". See, e.g., <u>Commissioner v. Tufts</u>, 461 U.S. 300, 311 n.11 (1983).[5] The net assets test is a corollary of the principle in <u>Dallas Transfer</u> that an insolvent debtor does not realize income when discharged of indebtedness. Under the net assets test, if the debtor remains insolvent (liabilities exceed assets) after being discharged of indebtedness, no assets have been freed as a result of the discharge since the debtor's assets are still more than offset by his postdischarge liabilities, and, thus, no gross income is realized; if the debtor is solvent (assets exceed liabilities) after being discharged, then the discharge has freed the debtor's assets from the offset of his liabilities to that extent, and,

_____

[4](...continued)
"Income From the Discharge of Indebtedness: The Progeny of <u>United States v. Kirby Lumber Co.</u>", 66 Cal. L. Rev. 1159, 1184 & n.90 (1978) (the Board's approach illustrates the "above water" principle).

[5]   But cf. Bittker & Thompson, <u>supra</u> at 1184 n.90 (stating that the above water principle in <u>Lakeland Grocery Co. v. Commissioner</u>, 36 B.T.A. 289 (1937), does not necessarily require acceptance of the freeing-of-assets theory; if horizontal equity as between a debtor coming out of bankruptcy and an insolvent debtor outside of bankruptcy is the guiding principle, the above water result may be justified by disregarding income realized from being voluntarily discharged of indebtedness outside of bankruptcy "only to the extent that the taxpayer's financial status after the composition or other arrangement with creditors is comparable to the bankruptcy outcome"). But see <u>infra</u> secs. II.C.2., 4.

thus, gross income is realized from the discharge.  In essence, the net assets test is simply an examination of the debtor's net worth after he is discharged of indebtedness--an increase in net worth gives rise to income, but a decrease in negative net worth does not.

### 2.  Codification of the Net Assets Test

The net assets test has been criticized, particularly for employing an improper criterion in the definition of income.[6] Congress, however, codified the net assets test in section 108(a)(1)(B), (a)(3), and (d)(3) as a means of determining an exclusion from gross income of an item of income derived from the discharge of indebtedness.  Aside from the parallel descriptions in the committee reports of the preexisting law and of the proposed insolvency exclusion, see supra sec. II.B.2., that codification is apparent from the statutory insolvency calculation coupled with the insolvency exclusion limitation provided in section 108(a)(3), which together share the same underlying analytical framework as the net assets test.  That framework requires an examination of the debtor's assets and

---

[6]    See, e.g., Eustice, "Cancellation of Indebtedness and the Federal Income Tax: A Problem of Creeping Confusion", 14 Tax L. Rev. 225, 246-247 (1959); see also Estate of Newman v. Commissioner, 934 F.2d 426, 427 (2d Cir. 1991) ("confusion as to the theoretical basis for taxing discharges of indebtedness has spawned an illogical, judge-made `insolvency exception'"), revg. T.C. Memo. 1990-230.  The net assets test and other judicially created insolvency exceptions have been described as "an emotional response by the courts to the plight of financially embarrassed debtors rather than * * * any strict application of judicial logic."  Eustice, supra at 246.

liabilities for the purpose of determining whether the debtor's net worth turns positive (assets exceed liabilities), i.e., whether assets are freed, as a result of the debtor's being discharged of indebtedness.[7]

### 3. The Freeing-of-Assets Theory and the Statutory Insolvency Calculation

From our examination of the statutory language, the legislative history, and the relevant cases cited in the committee reports, we conclude that the analytical framework of the insolvency exclusion and its related provisions is based on the freeing-of-assets theory. That theory establishes the foundation for understanding the nature of the examination to be afforded to obligations claimed to be liabilities for purposes of the statutory insolvency calculation.

---

[7] It should be noted that the net assets test requires an examination of the debtor's net worth after he is discharged of the indebtedness, whereas the statutory insolvency calculation requires an examination immediately before the discharge. That distinction, however, does not produce disparate results and is simply the product of the manner in which the insolvency exclusion and its limitation operate. For purposes of illustration, assume the following facts: (1) a debtor has indebtedness of $100 owed to C, assets of $130, and another liability of $100 and (2) C discharges the debtor of the indebtedness for payment of $20. The net assets test would find that, after the discharge, the debtor has assets of $110 ($130 - $20) and liabilities of $100 ($200 - $100), and, therefore, the debtor realizes income to the extent his assets exceed his liabilities, $10 ($110 - $100). The statutory insolvency calculation would provide that the debtor is insolvent by $70 ($200 - $130) and the amount of the exclusion under sec. 108(a)(1)(B) would be limited to that amount pursuant to sec. 108(a)(3); the debtor under sec. 61(a)(12) realizes $80 ($100 - $20) of income and excludes $70 of that amount under sec. 108(a)(1)(B), for net income recognition of $10 (same as the net assets test).

A solvent debtor is capable of meeting his financial obligations because his assets equal or exceed his liabilities. That excess (if any) is not increased when an obligation that offsets assets is paid in full because the reduction in liabilities is equal to the reduction in assets. If the reduction in liabilities exceeds the reduction in assets, then, under the freeing-of-assets theory, the solvent debtor has realized a gain to the extent of that excess. See, e.g., Milenbach v. Commissioner, 106 T.C. 184, 202 (1996); Cozzi v. Commissioner, 88 T.C. 435, 445 (1987) ("The general theory is that to the extent that a taxpayer has been released from indebtedness, he has realized an accession to income because the cancellation effects a freeing of assets previously offset by the liability arising from such indebtedness.") (citing United States v. Kirby Lumber Co., 284 U.S. 1 (1931)).[8]  Pursuant to the

---

[8]  That understanding of the nature of liabilities comports with the ordinary and common meaning of the term "liability": "That which one is under obligation to pay, or for which one is liable. Specif., in the pl., one's pecuniary obligations, or debts, collectively;--opposed to assets." Webster's New International Dictionary 1423 (2d ed. 1940).

It should also be noted that the freeing-of-assets theory, much like its descendant the net assets test, has been criticized:

A particularly troublesome legacy of * * * [the passage in Kirby Lumber that the transaction "made available $137,521.30 assets previously offset by the obligation of bonds now extinct"] has been the tendency of some courts to read Kirby Lumber as holding that it is the freeing of assets on the cancellation of indebtedness, rather than the cancellation itself, that

(continued...)

freeing-of-assets theory, a debtor does not realize income when discharged of a particular indebtedness, however, if his post-discharge liabilities equal or exceed his postdischarge assets (if any); i.e., under the net assets test, the debtor's liabilities equal or exceed his assets after the discharge (or, the statutory insolvency calculation shows that the debtor is insolvent by an amount greater than or equal to the discharge of indebtedness income, see supra note 7). Clearly, an indiscriminate inclusion of obligations to pay in the calculation of postdischarge liabilities (or, in the statutory insolvency calculation), without any consideration of how speculative those obligations may be, would render meaningless any inquiry as to whether assets are freed upon the discharge of indebtedness. Logic dictates that an obligation to pay is a liability under the freeing-of-assets theory only if it can be said with a satisfactory degree of certainty that the obligation offsets assets. The critical inquiry, of course, is the level of certainty that is satisfactory.

---

8(...continued)
    creates the taxable gain. Such reasoning misses the
    point. Income results from the discharge of
    indebtedness because the taxpayer received (and
    excluded from income) funds that he is no longer
    required to pay back, not because assets are freed of
    offsetting liabilities on the balance sheet. * * *

Bittker & Thompson, supra at 1165. That criticism, however, does not apply to a statutory exclusion from income that simply employs the freeing-of-assets theory to achieve objectives other than a definition of income. See infra sec. II.C.6.

Congress has not specified the minimum level of certainty, but Congress' indicated purpose of not burdening an insolvent debtor outside of bankruptcy with an immediate tax liability, see supra sec. II.B.2., together with the operation of the insolvency exclusion and its limitation under section 108(a)(3), in accordance with the statutory insolvency calculation, suggest that Congress intended to make a debtor's ability to pay an immediate tax on income from discharge of indebtedness the controlling factor in determining whether a tax burden is imposed.[9]  Indeed, if a debtor has the ability to pay an immediate tax, in the sense that assets of the debtor exceed liabilities that he will be called upon to pay (and not in the sense that the debtor simply has assets on hand), the concern of imposing an unfair or unwarranted immediate tax burden vanishes.

Ability to pay an immediate tax (i.e., the statutory notion of insolvency) is a question of fact and, although Congress has specifically instructed us that (in determining ability to pay) assets are to be valued at fair market value, see sec. 108(d)(3), Congress has not otherwise instructed us on how to make that finding or what measure of persuasion carries the burden of proof.  A taxpayer with the burden of proof must, thus, persuade us of whether and in what amount he (as debtor) will be called

---

[9]    The Commissioner apparently agrees.  See Rev. Rul. 92-53, 1992-2 C.B. 48, 49 (when a taxpayer's liabilities exceed the fair market value of his assets, "the taxpayer is unable to pay either the indebtedness or the tax").

upon to pay an obligation claimed to be a liability for purposes of the statutory insolvency calculation under the usual measure of persuasion applicable in this Court.[10] The usual measure of persuasion required to prove a fact in this Court is "preponderance of the evidence", see, e.g., Schaffer v. Commissioner, 779 F.2d 849, 858 (2d Cir. 1985), affg. in part and remanding Mandina v. Commissioner, T.C. Memo. 1982-34, which means that the proponent must prove that the fact is more probable than not, see, e.g., 2 McCormick on Evidence, sec. 339, at 439 (4th ed. 1992). Therefore, a taxpayer claiming the benefit of the insolvency exclusion must prove (1) with respect to any obligation claimed to be a liability, that, as of the calculation date, it is more probable than not that he will be called upon to pay that obligation in the amount claimed and (2) that the total liabilities so proved exceed the fair market value of his assets, see sec. 108(d)(3). See infra sec. II.C.7. for further discussion relating to the measure of proof required for an obligation claimed to be a liability for purposes of the statutory insolvency calculation.

---

[10] The terms of the agreement creating the claimed obligation to pay generally would determine whether and in what amount the taxpayer will be called upon to pay; e.g., with respect to petitioners' guarantees, the likelihood of a bankruptcy event and the amount that the bank would have the right to demand upon such occurrence governs the analysis, see infra sec. II.D.2. We acknowledge, however, that the examination in other contexts of obligations claimed to be liabilities for purposes of the statutory insolvency calculation may involve considerations not addressed in this report.

### 4. Horizontal Equity is Not the Guiding Principle

Although we have concluded that the analytical framework of the insolvency exclusion and its related provisions is based on the freeing-of-assets theory, we note that the committee reports indicate that Congress intended to achieve a measure of horizontal equity in enacting section 108(a)(1)(A) (the bankruptcy exclusion) and the insolvency exclusion; i.e., affording similar treatment to debtors coming out of bankruptcy and insolvent debtors outside of bankruptcy:

> To preserve the debtor's "fresh start" after bankruptcy, the bill provides that no income is recognized by reason of debt discharge in bankruptcy, so that a debtor coming out of bankruptcy (or an insolvent debtor outside bankruptcy) is not burdened with an immediate tax liability. * * * [Emphasis added.]

S. Rept. 96-1035, at 10 (1980), 1980-2 C.B. 620, 624; H. Rept. 96-833, at 9 (1980). That expression of legislative purpose may suggest that, in making an examination of obligations claimed to be liabilities for purposes of the statutory insolvency calculation, Congress intended an examination that is dependent on the treatment of such obligations in the bankruptcy context. See supra note 5; see also infra sec. II.C.7. (petitioners' "likelihood of occurrence" test). The broad reach of the insolvency exclusion, however, indicates that Congress recognized the significant differences between a debtor coming out of bankruptcy and an insolvent debtor outside of bankruptcy and realized that different avenues of excluding income from

discharge of indebtedness and the consequences thereof were necessary and inevitable.

Title 11 of the United States Code (the Bankruptcy Code) offers bankruptcy relief for various types of debtors. 1 Collier on Bankruptcy, par. 1.03, at 1-21 (15th ed. Revised 1996). Chapter 7 of the Bankruptcy Code governs liquidation of a debtor, colloquially known as "straight bankruptcy", and provides the mechanism for "the collection, liquidation, and distribution of the property of the debtor", culminating in the discharge of the debtor. 6 Collier on Bankruptcy, par. 700.01, at 700-1 (15th ed. Revised 1996). Being thus relieved of his debts, the debtor coming out of bankruptcy is accorded a fresh start. To preserve that fresh start, the debtor pursuant to the bankruptcy exclusion is not burdened with an immediate tax liability on account of income from the discharge in bankruptcy of indebtedness.

For the insolvent debtor outside of bankruptcy, until (and unless) all of his debts are settled or discharged, he is not in the identical fresh start position as the debtor coming out of bankruptcy. Section 108(d)(3) recognizes that fact and provides for a calculation of insolvency and not an actual marshaling and sale of assets followed by a satisfaction of debts. When Congress codified the net assets test, see supra sec. II.C.2., the insolvency exclusion was made available to all insolvent

debtors outside of bankruptcy.[11]  The necessary consequence of that choice is that the nature of the examination to be afforded to obligations claimed to be liabilities for purposes of the statutory insolvency calculation depends on an analytical framework based on the freeing-of-assets theory and not on the treatment of such obligations in some analogous context, e.g., "debt" in the bankruptcy context.[12]

     5.   Respondent's Plain Meaning Argument

Respondent argues that the term "liabilities" in section 108(d)(3) must be given its plain meaning, which requires excluding contingent liabilities from the statutory insolvency calculation.  As evidence of such exclusive meaning, respondent relies on principles of financial accounting established by the Financial Accounting Standards Board (FASB).  Respondent asserts

_____

[11]  If Congress were interested primarily in promoting horizontal equity, Congress could have adopted the more restrictive approach suggested by the American Law Institute in its Draft of a Federal Income Tax Statute.  See Surrey & Warren, "The Income Tax Project of the American Law Institute:  Gross Income, Deductions, Accounting, Gains and Losses, Cancellation of Indebtedness", 66 Harv. L. Rev. 761, 817 (1953); see also Fifth Ave.-Fourteenth St. Corp. v. Commissioner, 147 F.2d 453, 457 (2d Cir. 1944) (test based on a hypothetical liquidation of the debtor), revg. 2 T.C. 516 (1943).

[12]  See, e.g., Bankruptcy Code secs. 101(5), 101(12), 726, 727. In addition, adherence to bankruptcy procedures and policies, for example, the estimation of contingent or unliquidated debt pursuant to Bankruptcy Code sec. 502(c)(1), among other things, would unnecessarily and unjustifiably import unrelated considerations into the statutory insolvency calculation.  See Bankruptcy Code sec. 502(c)(1) (requiring estimation when the fixing or liquidation of any contingent or unliquidated claim would unduly delay the administration of the bankruptcy petition).

that: "Under Generally Accepted Accounting Principles [GAAP], true contingent liabilities are merely disclosed in the footnotes to the financial statements as petitioner Hepburn did in this case, rather than accrued in the statements as a liability. See FASB Statement No. 5".

FASB establishes and improves standards of financial accounting and reporting for the guidance and education of the public, including issuers, auditors, and users of financial statements. Kay & Searfoss, Handbook of Accounting and Auditing 46-8 (2d ed. 1989). Respondent directs our attention to FASB Statement of Financial Accounting Standards No. 5, Accounting for Contingencies (FASB Statement No. 5). By FASB Statement No. 5, FASB establishes standards of financial accounting and reporting for "loss contingencies", which term is defined to mean, in general, a situation of possible loss that will be resolved in the future, see FASB Statement No. 5, par. 1. The likelihood of a loss can range from "probable" to "remote". Id. at par. 3. The estimated loss associated with a liability must be accrued by a charge to income (which would result in a balance sheet liability) if both (1) information indicates that it is probable that the liability has been incurred and (2) the amount of the loss can be reasonably estimated. Id. at par. 8.[13]

---

[13] Guarantees are specifically included in the examples of loss contingencies contained in FASB Statement No. 5. FASB Statement No. 5., par. 4.h. ("Guarantees of indebtedness of others"). The current practice under Generally Accepted Accounting Principles
(continued...)

Certain guarantees, which are contingent, must be reported as a liability under GAAP.  Therefore, whether an obligation, such as a guarantee, is a "true" contingent liability cannot be ascertained without an examination of the nature of the contingency.[14]  Although the accrual or nonaccrual of a liability on a taxpayer's balance sheet may provide evidence as to whether the taxpayer will be called upon to pay that liability, such reporting for financial accounting purposes is not dispositive. The treatment of contingent liabilities under GAAP is consistent with the examination required of obligations claimed to be liabilities for purposes of the statutory insolvency calculation, see supra sec. II.C.3.; however, this Court shall not abdicate its responsibility to examine such obligations independently.

---

[13](...continued)
(GAAP) with respect to guarantees is as follows:

> It is accepted current practice that a guarantor does not report on its balance sheet a liability for the obligation under guarantee; typically, however, there is disclosure of guarantees in footnotes. If it is determined "probable" that the guarantor will have to perform under the guarantee agreement (i.e., pay the lender on behalf of the borrower), an accrual for such amounts should be established by the guarantor in accordance with the principles of FASB Statement 5, "Accounting for Contingencies."

FASB Emerging Issues Task Force, Issue Summary No. 85-20 (emphasis added).

[14]    The Commissioner apparently recognizes that principle.  See Rev. Rul. 97-3, 1997-2 I.R.B. 5, 6 ("Affixing a label to an undertaking (for example, referring to an arrangement as a `guarantee') does not alone decide its character.").

### 6. Respondent's Consistency Argument

In Landreth v. Commissioner, 50 T.C. 803, 812-813 (1968), we rejected the Commissioner's suggestion that any person who guarantees the payment of a loan realizes income when the principal debtor makes payments on the loan. We distinguished the situation of a guarantor, who "obtains nothing except perhaps a taxable consideration for his promise", from that of a debtor, "who as a result of the original loan obtains a nontaxable increase in assets", and who, if relieved of the obligation to repay the loan, enjoys an increase in net worth that "may be properly taxable. United States v. Kirby Lumber, Co., 284 U.S. 1 (1931)." Id. at 813. This Court stated: "[W]here the guarantor is relieved of his contingent liability, either because of payment by the debtor to the creditor or because of a release given him by the creditor, no previously untaxed accretion in assets thereby results in an increase in net worth." Id.

Respondent relies heavily on Landreth for the proposition that petitioners are precluded "from using their status as guarantors to render themselves insolvent within the meaning of I.R.C. § 108." Respondent argues:

> The Landreth Court reasoned that "[p]ayment by the principal debtor does not increase the guarantor's net worth; it merely prevents it, pro tanto, from being decreased." Landreth v. Commissioner, 50 T.C. at * * * [813]. This rationale is sound for several reasons. The guarantor did not receive the tax-free accretion in wealth upon payment of the loan funds, but rather the principal obligor did. When the principal obligor makes payments pursuant to the loan, there is

no liability to the guarantor that is being reduced by such payments which would increase the guarantor's net worth. This is so because the guarantee did not represent a liability to the guarantor in the first instance, it merely represented the possibility of a liability in the future upon the occurrence or nonoccurrence of some future event.

* * * the guarantees were not a liability to petitioners within the meaning of I.R.C. § 108 for purposes of income or the insolvency exception to that income. To hold otherwise would result in an inconsistent application of this statute. If discharge of the contingent liability does not give rise to discharge income pursuant to I.R.C. § 108, Congress could not have intended for taxpayers to use that very same debt to render themselves insolvent under that section. [Fn. ref. omitted; emphasis added.]

We believe that respondent misreads Landreth v. Commissioner, supra. The touchstone of this Court's analysis in Landreth is the absence of any "previously untaxed accretion in assets" that, by reason of the guarantor's being relieved of the contingent liability, "results in an increase in net worth", id. at 813, and not the absence of a liability, the reduction of which increases the guarantor's net worth. Indeed, the cases relied on by this Court in Landreth, Commissioner v. Rail Joint Co., 61 F.2d 751 (2d Cir. 1932), affg. 22 B.T.A. 1277 (1931); Fashion Park, Inc. v. Commissioner, 21 T.C. 600 (1954), specifically rejected the rationale that respondent now suggests is the basis of this Court's decision in Landreth. See Commissioner v. Rail Joint Co., supra at 752 ("But it is not universally true that by discharging a liability for less than its face the debtor necessarily receives a taxable gain.");

Fashion Park, Inc. v. Commissioner, supra at 604.  The basis of the decision in Landreth is that a guarantor does not obtain initially a nontaxable increase in assets for his promise. Therefore, respondent may not use Landreth to argue that, because relief from a guarantee does not give rise to discharge of indebtedness income, since a guarantee is not a liability, considering a guarantee as a liability for purposes of the statutory insolvency calculation results in an inconsistent application of section 108.

Respondent's argument, in any event, reveals a more fundamental misconception regarding the insolvency exclusion and its related provisions.  Without any justification in the Code or in the legislative history of section 108, respondent assumes that the insolvency exclusion and section 61(a)(12), which defines gross income as including income from discharge of indebtedness,[15] are identical in terms of legislative purpose; i.e., that the scope of both provisions is the definition of the term "gross income".  When respondent argues that Congress could not have intended for taxpayers to use liabilities, the discharge of which does not give rise to income, to exclude discharge of

---

[15]    For purposes of sec. 108, sec. 108(d)(1) defines the term "indebtedness of the taxpayer" as "any indebtedness--(A) for which the taxpayer is liable, or (B) subject to which the taxpayer holds property."  There is no indication that the term "indebtedness" in sec. 61(a)(12) with respect to a particular taxpayer differs from the definition provided in sec. 108(d)(1).

indebtedness income, respondent fails to recognize that the apparent inconsistency may be an inconsistency in policy.

As Congress enacted the insolvency exclusion, it eliminated the net assets test as a judicially created <u>exception</u> to the general rule of income from the discharge of indebtedness. See sec. 108(e)(1).[16] The fundamental difference between the insolvency exclusion and the net assets test is that the insolvency exclusion is applicable only if there exists income from the discharge of indebtedness, whereas the net assets test engages in the threshold inquiry. Therefore, unlike the net assets test, the insolvency exclusion does not necessarily invade the province of section 61(a)(12).

Essentially, the insolvency exclusion defers to section 61(a)(12) as to the definition of the term "gross income", but represents a policy judgment that certain of that income should not give rise to an immediate tax liability. The relevant committee reports intimate that the policy judgment underlying

---

[16] Cf. Bittker & McMahon, Federal Income Taxation of Individuals, par. 4.5, at 4-26 (2d ed. 1995) ("by virtue of § 108(e)(1), § 108(a)(1) now preempts the field, precluding any other `insolvency exception.' This attempt to outlaw judge-made insolvency exceptions is technically flawed because it applies only <u>if</u> the taxpayer realizes `income from the discharge of indebtedness' and, hence, does not help in determining <u>whether</u> a transaction by an insolvent debtor generates any income. The message will be heeded, however, even though the draftsman blundered." (fn. ref. omitted)). It appears, however, that the draftsman did not blunder because sec. 108(e)(1) applies for purposes of title 26 of the United States Code (the Internal Revenue Code) without regard to sec. 108(a)(1).

the insolvency exclusion serves a humanitarian purpose--to avoid burdening an insolvent debtor outside of bankruptcy with an immediate tax liability, see supra sec. II.B.2.  Even if there exists some consistency in policy between section 61(a)(12) and the insolvency exclusion, respondent's argument assumes that only liabilities, the discharge of which gives rise to income, can offset assets (which is the role of liabilities in the analytical framework of the insolvency exclusion and its related provisions).  There is simply no basis for respondent's assumption.  In sum, nothing in the Code, the legislative history of section 108, or any relevant authority requires an identity in the class of obligations to pay for purposes of both the statutory insolvency calculation and discharge of indebtedness income under section 61(a)(12).[17]

       7.  <u>Petitioners' "Likelihood of Occurrence" Test</u>

As an alternative to the argument that the full amount of both petitioners' guarantees and the State tax exposure should be

---

[17]  Cf. sec. 108(e)(2), which provides:  "No income shall be realized from the discharge of indebtedness to the extent that payment of the liability would have given rise to a deduction."  Congress did not provide that a sec. 108(e)(2) "liability" is not a liability for purposes of the statutory insolvency calculation, yet respondent's consistency argument leads to that conclusion.

In addition, to the extent that respondent's consistency argument relates to consistency in determining the existence of indebtedness and of liabilities, we believe that the standard set forth <u>supra</u> sec. II.C.3. creates no inconsistency.  Cf. <u>Zappo v. Commissioner</u>, 81 T.C. 77, 89 (1983) ("The very uncertainty of the highly contingent replacement obligation prevents it from reencumbering assets freed by discharge of the true debt until some indeterminable date when the contingencies are removed.").

considered as liabilities for purposes of the statutory insolvency calculation, petitioners argue that the Court should apply a "likelihood of occurrence" test.  Relying on Covey v. Commercial Natl. Bank, 960 F.2d 657 (7th Cir. 1992), petitioners suggest that this Court value the amount of a liability, "by multiplying the full amount of the liability by the probability of payment".

In Covey v. Commercial Natl. Bank, supra at 660, the Court of Appeals for the Seventh Circuit stated that "[t]o decide whether a firm is insolvent within the meaning of § 548(a)(2)(B)(i) [of the Bankruptcy Code], a court should ask: What would a buyer be willing to pay for the debtor's entire package of assets and liabilities?  If the price is positive, the firm is solvent; if negative, insolvent."  The court held that, in making the insolvency determination for purposes of a preference-recovery action under section 548 of the Bankruptcy Code,[18] contingent liabilities must be discounted by the probability of their occurrence.  Id. at 660-661.

To allow debtors to avoid an immediate tax liability by virtue of a contingent liability that the debtor will not likely be called upon to pay, a consequence of the likelihood of occurrence test advanced by petitioners, would undermine the

---

[18]    Sec. 548 of the Bankruptcy Code authorizes the trustee "to avoid a transaction made within one year before the commencement of the bankruptcy case, that depletes the debtor's assets to the detriment of the bankruptcy estate."  5 Collier on Bankruptcy, par. 548.01, at 548-5 (15th ed. Revised 1996).

purposes of the insolvency exclusion and its related provisions. Liabilities that a debtor will not likely be called upon to pay do not offset assets and cannot be recognized as liabilities within the analytical framework of the insolvency exclusion and its related provisions. The following example illustrates the need to show the likelihood of a demand for payment on a claimed liability. Assume that a debtor is discharged from indebtedness of $99 for payment of $98. Prior to the discharge, the debtor had cash in the amount of $100 and had guaranteed a friend's debt of $10, which friend was solvent and not likely to default (20 percent chance of total default) as the primary obligor. Petitioners would argue that the debtor in the example has assets of $100 and liabilities of $101 ($99 + 20 percent of $10 = $101) and is entitled to exclude the $1 of discharge of indebtedness income. The debtor in the example, under petitioners' test, avoids an immediate tax liability on the $1 of income by virtue of a liability that the debtor will not likely be called upon to pay (20 percent likelihood of occurrence of total default is less than "more likely than not"). In essence, the debtor avoids an immediate tax liability when the preponderance of the evidence suggests that the debtor has the ability to pay such tax, see supra sec. II.C.3. That result frustrates Congress' purpose in enacting the insolvency exclusion and its related provisions and, therefore, is unacceptable.

## 8.  Conclusion

In conclusion, a taxpayer claiming the benefit of the insolvency exclusion must prove (1) with respect to any obligation claimed to be a liability, that, as of the calculation date, it is more probable than not that he will be called upon to pay that obligation in the amount claimed and (2) that the total liabilities so proved exceed the fair market value of his assets.

### D.  Application

#### 1.  Petitioners' Burden of Proof

As stated in section I.A., supra, the parties have stipulated that the exposure of each of the Merkels and the Hepburns pursuant to petitioners' guarantees and the State tax exposure was $1 million and $490,000, respectively, and inclusion of the amount of their exposure under either obligation would make each of them insolvent to the extent of the full amount of the discharge of indebtedness income to each.  Petitioners bear the burden of proof, Rule 142(a), but have proposed no findings of fact with respect to the other liabilities or the fair market value of the assets of either the Merkels or the Hepburns as of the measurement date.  Thus, we must conclude that petitioners intend to prove that they (each of the Merkels and the Hepburns) were insolvent by showing that the amount of the liability under either, both, or the sum of petitioners' guarantees and the State tax exposure was at least $490,000.  If it were any less, we have

no basis for finding that petitioners did not have assets equal to (or in excess of) their liabilities (i.e., that petitioners were insolvent).

### 2. Petitioners' Guarantees

The measurement date (the date on which petitioners must prove their insolvency) is August 31, 1991.  By that date, SLC had defaulted on the SLC note, which petitioners had guaranteed, and petitioners and the bank had entered into the agreement.  Under the agreement, among other things, if SLC and petitioners (and certain others) avoided bankruptcy for 400 days after the settlement date (August 2, 1991), petitioners would be released from their guarantees without having to make any payment to the bank.  The 400-day period ended September 5, 1992.

By the terms of petitioners' guarantees, petitioners' obligations to pay the SLC note were unconditional.  Moreover, we assume those obligations became fixed on April 16, 1991, when SLC was in default on the SLC note.  Nevertheless, on the measurement date, those fixed obligations had been replaced by obligations that were dependent on certain conditions and, thus, were contingent obligations.

To address the likelihood of certain of those conditions, petitioners propose the following finding of fact (to which respondent objects):

> 42.  During the continuing efforts by SLC and the Petitioners to work with creditors, there was a

> continuing challenge as to whether acceptable workout arrangements could be made with these creditors. By the end of the summer of 1991 at about the time of the * * * discharge of indebtedness there was a <u>real possibility</u> that SLC and/or the guarantors would file for bankruptcy protection or that creditors would file for them. * * * [Emphasis added.]

Petitioners support that proposed finding of fact with the testimony of Robert Kennedy, an attorney who represented SLC in a general business capacity and who represented David Hepburn and Dudley Merkel in connection with certain guarantees of obligations of SLC. Based, in part, on his memory that SLC, David Hepburn, and Dudley Merkel owed a substantial amount ("I think it was $800,000"), he testified that there was "a real possibility that they could file bankruptcy at that time [by the end of the summer of 1991]". Petitioners also point to the testimony of David Hepburn, who testified that, by the end of the summer of 1991, the possibility of bankruptcy for SLC or petitioners was not "insignificant". Petitioners imply that the State tax assessment was a significant factor giving rise to the possibility of bankruptcy.

The uncertain variable on the measurement date was the probability of a bankruptcy event; the bankruptcy of either SLC or petitioners (or certain others) was a condition precedent to any demand for payment by the bank. None of the petitioners, however, provided sufficient details of their personal financial situations from which we could draw a conclusion as to the likelihood on the measurement date of a bankruptcy event.

Although the testimony presented by petitioners indicates that SLC may have been experiencing some cash-flow problems after the agreement, SLC apparently had sufficient liquidity to pay both Dudley Merkel and David Hepburn hefty salaries for SLC's fiscal years ending February 29, 1992, and February 28, 1993. We take those payments as some evidence of the nonprecarious financial situations of both SLC and petitioners on the measurement date and during the 400-day workout period. The fact that the 400-day workout period had 371 days to run on the measurement date is a fact to be taken into account, but it does not convince us, as petitioners suggest, that the probability of a demand for payment under petitioners' guarantees (as renegotiated) was 92 percent. The State tax assessment was ultimately abated, and petitioners have failed to convince us that such result was not foreseen. Considering all of the evidence, petitioners have failed to persuade us that a bankruptcy event was likely to occur. Such a finding is not inconsistent with the testimony of Robert Kennedy and David Hepburn that the possibility of bankruptcy was "real" and not "insignificant". Therefore, petitioners have failed to prove that, as of the measurement date, they would be called upon to pay any amount as a result of petitioners' guarantees.

### 3. State Tax Exposure

The State tax assessment became final on June 14, 1991, in the amount of $980,511.84. As in effect and in relevant part,

North Carolina law provides the following regarding the

responsibility of corporate officers for corporate taxes:

> (b)  Each responsible corporate officer is
> personally and individually liable for all of the
> following:
>
>> (1)  All sales and use taxes collected
>> by a corporation upon taxable transactions of
>> the corporation.
>>
>> (2)  All sales and use taxes due upon
>> taxable transactions of the corporation but
>> upon which the corporation failed to collect
>> the tax, but only if the responsible officer
>> knew, or in the exercise of reasonable care
>> should have known, that the tax was not being
>> collected.
>
> *     *     *     *     *     *     *
>
> The liability of the responsible corporate officer is
> satisfied upon timely remittance of the tax to the
> Secretary by the corporation.  If the tax remains
> unpaid by the corporation after it is due and payable,
> the Secretary may assess the tax against, and collect
> the tax from, any responsible corporate officer in
> accordance with the procedures in this Article for
> assessing and collecting tax from a taxpayer.  As used
> in this section, the term "responsible corporate
> officer" includes the president and the treasurer of
> the corporation and any other officers assigned the
> duty of filing tax returns and remitting taxes to the
> Secretary on behalf of the corporation.  * * *  [N.C.
> Gen. Stat. sec. 105-253(b) (1991).]

North Carolina law also provides procedures for assessing and

collecting tax from a taxpayer.  N.C. Gen. Stat. sec. 105-

241.1(a) (1991) requires the Secretary of the Department of

Revenue to send written notice to the taxpayer of the kind and

amount of tax due, and N.C. Gen. Stat. sec. 105-241.1(c) (1991)

provides that the taxpayer is entitled to an opportunity for a

hearing upon request.

Based on a proposed finding of fact by respondent, to which petitioners stated that they had no objection, we have found that the State tax assessment was for sales and use taxes that <u>were never collected</u> by SLC. That being the case, under the North Carolina statute, Dudley Merkel and David Hepburn could be liable as corporate officers <u>only</u> if they were responsible officers who knew, or should have known, that the tax was not being collected. There is no persuasive evidence that they knew, or should have known, that the tax was not being collected. Also, N.C. Gen. Stat. sec. 105-253(b) (1991) (flush language) appears to grant the Secretary of the Department of Revenue some discretion in assessing and collecting the tax from responsible corporate officers.

The Department of Revenue never proposed nor made an assessment against any of petitioners relating to the State tax assessment. Petitioners have failed to prove that any assessment was ever likely to be made against Dudley Merkel and David Hepburn. Therefore, we have no basis to find that, as of the measurement date, the State tax exposure represented an obligation to pay that would result in petitioners' being called upon to pay any amount on account thereof.

III. <u>Conclusion</u>

Petitioners have failed to prove that they would be called upon to pay any amount with respect to either petitioners' guarantees or the State tax exposure, and, thus, neither

constitutes a liability for purposes of section 108(d)(3).
Therefore, petitioners have failed to prove that either the
Merkels or the Hepburns were insolvent on the measurement date
for purposes of section 108(a)(1)(B).  On that basis,
respondent's determinations of deficiencies are sustained in
full.

Decisions will be entered

for respondent.