T.C. Summary Opinion 2018-43

UNITED STATES TAX COURT

RICHARD BRYAN JACKSON AND NORA IRENE JACKSON,
Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10703-16S.                    Filed September 17, 2018.

Krzysztof Wendland, for petitioners.

Jonathan Bartolomei, Monica E. Koch, and Aaron M. Greenberg,

for respondent.

SUMMARY OPINION

GUY, Special Trial Judge:  This case was heard pursuant to the provisions

of section 7463 of the Internal Revenue Code in effect when the petition was

filed.[1]  Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined a deficiency of $2,921 in petitioners' Federal income tax for the taxable year 2013 (year in issue).  Petitioners, husband and wife, filed a timely petition for redetermination with the Court.  At the time the petition was filed, they resided in the State of New York.

The sole issue for decision is whether Mr. Jackson was insolvent within the meaning of section 108 at the time that he realized income attributable to discharged indebtedness.[2]

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the taxable year 2013, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Monetary amounts are rounded to the nearest dollar.

[2]The notice of deficiency includes an adjustment of $134 to a deduction that petitioners had claimed for student loan interest.  Petitioners did not assign error to that adjustment in the petition for redetermination, and it is therefore deemed conceded.  Rule 34(b)(4).

Background[3]

I. Mr. Jackson's State Retirement Benefits

In 1980 Mr. Jackson began working for the State of New York (State), and he was enrolled at that time as a tier 3 participant in the New York State and Local Retirement System (retirement plan). As a tier 3 participant in the retirement plan, Mr. Jackson was obliged to make biweekly contributions equal to 3% of his salary until he accrued 10 years of service credit. In 1989 Mr. Jackson left his job with the State, and he received a distribution of about $11,500 from the retirement plan.

Twenty-two years later, in May 2011, Mr. Jackson returned to State employment. At that time, he was initially enrolled as a tier 5 participant in the retirement plan, and he was obliged to make biweekly contributions of 3% of his salary for the duration of his State employment.

In 2013, however, Mr. Jackson took advantage of an opportunity to reinstate his former tier 3 status by agreeing to repay to the retirement plan the $11,500 distribution that he had received in 1989, plus 5% interest computed from the time that he first left State employment. The arrangement was outlined in a letter that Mr. Jackson received from the retirement plan which stated in relevant part:

---

[3]Some of the facts have been stipulated.

> Please be advised that your reinstatement includes an obligation to repay to * * * [the retirement plan] the principal and interest due on the contributions returned to you when you separated from state service * * *

> Pursuant to your agreement with * * * [the retirement plan], mandatory arrears payments in the amount of $245.66 will be withheld each pay period beginning January 2013 and will continue for 228 payroll periods. Should you leave state service prior to full payment of your arrears, * * * [the retirement plan] will reduce your retirement benefit to compensate for the balance due, as provided by * * * [the retirement plan] regulations."

Mr. Jackson expected that tier 3 status would provide increased retirement benefits relative to tier 5 status.

Although Mr. Jackson made the buy-back payments described above for about two years, his job with the State was eliminated in 2015, and he retired at that time. Mr. Jackson's monthly retirement benefit was reduced because he had not fully repaid the retirement plan in accordance with the buy-back agreement described above.

## II. Mr. Jackson's Discharge of Indebtedness

In 2013 Mr. Jackson realized income from discharged indebtedness of $11,552 as follows: Chase Bank discharged debts of $3,510 and $4,685 on September 15 and November 6, 2013, respectively, and FIA Card Services discharged debt of $3,357 on November 29, 2013.

## III.  Petitioners' Joint Income Tax Return

Petitioners filed a joint Federal income tax return for the taxable year 2013. They did not report Mr. Jackson's discharged indebtedness as income. Respondent examined petitioners' return and determined that Mr. Jackson was obliged to include discharged indebtedness of $11,552 in taxable income.

## IV.  Mr. Jackson's Schedule of Assets and Liabilities

At trial petitioners submitted to the Court a schedule showing Mr. Jackson's assets and liabilities as of the dates that his debts were discharged in 2013. Mr. Jackson's buy-back payments appear on the schedule as liabilities of $52,326 and $51,343 as of September and November 2013, respectively.  His retirement plan account balances appear on the schedule as assets valued at $9,554 and $10,536 as of September and November 2013, respectively.  The parties agree that if Mr. Jackson's buy-back payments constitute a liability for purposes of section 108, then he was insolvent when he realized discharge of indebtedness income during the year in issue.

## Discussion

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer normally bears the burden of proving those

determinations are erroneous. Rule 142(a)(1); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).[4] Exclusions from gross income are matters of legislative grace and are construed narrowly in order to maximize the taxation of any accession to wealth. <u>Robinson v. Commissioner</u>, 102 T.C. 116, 125 (1994), <u>aff'd in part, rev'd in part</u>, 70 F.3d 34 (5th Cir. 1995).

Gross income includes all income from whatever source derived, and income from discharge of indebtedness is included in this broad definition. Sec. 61(a)(12); <u>United States v. Kirby Lumber Co.</u>, 284 U.S. 1, 3 (1931); sec. 1.61-12(a), Income Tax Regs. "The underlying rationale for such inclusion is that to the extent a taxpayer is released from indebtedness, he or she realizes an accession to income due to the freeing of assets previously offset by the liability." <u>Jelle v. Commissioner</u>, 116 T.C. 63, 67 (2001) (citing <u>Kirby Lumber Co.</u>); <u>see</u> <u>Cozzi v. Commissioner</u>, 88 T.C. 435, 445 (1987). The amount includible in income generally is the difference between the face value of the debt and the amount paid in satisfaction of the debt. <u>Babin v. Commissioner</u>, 23 F.3d 1032, 1034 (6th Cir. 1994), <u>aff'g</u> T.C. Memo. 1992-673. The income normally is recognized for the

---

[4]The facts relevant to the disposition of this case are not in dispute. Consequently, the assignment of the burden of proof is immaterial.

year the debt is canceled. Montgomery v. Commissioner, 65 T.C. 511, 520 (1975).

Section 108(a)(1)(B) excludes discharge of indebtedness income from gross income if the discharge occurs when the taxpayer is insolvent. A taxpayer is insolvent if, immediately before the discharge of debt, his liabilities exceeded the fair market value of his assets. Sec. 108(d)(3). The amount of income excluded by virtue of a taxpayer's insolvency may not exceed the amount by which the taxpayer is insolvent. Sec. 108(a)(3).

As the Court noted in Merkel v. Commissioner, 109 T.C. 463, 468 (1997), aff'd, 192 F.3d 844 (9th Cir. 1999), neither section 108 nor the regulations related to that provision define the term "liabilities".[5] In Merkel, the Court considered whether the taxpayers' contingent obligations (arising from personal guaranties of a loan) constituted liabilities within the meaning of section 108(d)(3). In the absence of a definition in the statute or the regulations, and after reviewing the legislative history underlying section 108, the Court concluded in relevant part that "a taxpayer claiming the benefit of the insolvency exclusion must prove * * *

---

[5]Black's Law Dictionary 997 (10th ed. 2014) defines the term "liability" broadly as "the quality, state, or condition of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment".

with respect to any obligation claimed to be a liability, that, as of the calculation date, it is more probable than not that he will be called upon to pay that obligation in the amount claimed".  Merkel v. Commissioner, 109 T.C. at 484.

Mr. Jackson maintains that his decision to make the retirement plan buy-back payments was economically sound.  In short, by entering into the agreement and making what the State labeled and he considered to be mandatory buy-back payments, he was reinstated as a tier 3 participant and would only be obliged to make buy-back payments for 228 pay periods, or roughly 8-1/2 years.  In contrast, if he remained a tier 5 participant, he would have been obliged to make biweekly contributions of 3% of his salary for the duration of his employment with the State.

Although we have no reason to question petitioner's decision to make the buy-back payments, merely affixing a label to a particular payment or obligation is not determinative of its true nature.  See, e.g., Boulez v. Commissioner, 83 T.C. 584, 591 (1984) (and cases cited threat).  In particular, we are obliged to evaluate the true nature of the obligation and determine whether it is in fact a liability.

Mr. Jackson's buy-back payments served as a substitute for regular retirement plan contributions (i.e., biweekly payroll deductions of 3% of pay) and each payment was credited to his retirement account.  In other words, unlike the

taxpayers' contingent obligations to a third-party creditor that the Court considered in Merkel, Mr. Jackson's payments were made to his own account to provide savings for retirement. In practical terms Mr. Jackson was merely moving money from one pocket to another.

Moreover, Mr. Jackson was obliged to make the payments only so long as he remained employed by the State (and for a period not to exceed 228 weeks). Consistent with that proposition, the record reflects that the State could not (and did not) call upon Mr. Jackson to continue to make the buy-back payments (or any retirement plan contributions) after his employment ended in 2015. In this light, the buy-back payments were contingent and amounted to a liability only to the extent that Mr. Jackson remained employed and actually made a payment. Under the circumstances, treating Mr. Jackson's obligation to make future buy-back payments as a liability in the course of determining his solvency at the time that he realized income from discharged indebtedness in 2013 is wholly speculative and improperly distorts the net assets analysis required under section 108(d)(3).

In conclusion, because the buy-back payments were deposited to Mr. Jackson's retirement account (as opposed to offsetting a debt to a third party) and did not carry legal consequences for nonpayment, they do not constitute a liability under section 108(d)(3). Accordingly, Mr. Jackson was not insolvent

when he realized income attributable to discharged indebtedness and is not entitled to an exclusion from gross income under section 108(a)(1)(B).

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.