116 T.C. No. 9


UNITED STATES TAX COURT


RODERICK E. CARLSON AND JEANETTE S. CARLSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12068-99.                    Filed February 23, 2001.


        Ps, husband and wife, purchased a fishing vessel
(vessel).  They financed that purchase by borrowing
money from a bank.  As security for the loan, Ps grant-
ed the bank a mortgage interest in the vessel.  Ps
became delinquent in making payments to the bank on the
loan, and the bank foreclosed on the vessel, sold it as
part of that foreclosure, used the proceeds from that
sale to reduce the outstanding principal balance of the
loan, and discharged the remaining balance of the loan.
As a result, Ps realized capital gain of $28,621 and
discharge of indebtedness (DOI) income of $42,142.

        Ps excluded the DOI income from their gross income
pursuant to the insolvency exception of sec.
108(a)(1)(B), I.R.C., because they determined that they
were insolvent within the meaning of sec. 108(d)(3),
I.R.C.  In making the insolvency calculation prescribed
by sec. 108(d)(3), I.R.C., Ps excluded certain assets
that they claim are exempt from the claims of creditors
under applicable State law.  The parties agree that if

such assets may not be excluded in making that calculation, Ps were not insolvent within the meaning of sec. 108(d)(3), I.R.C., and may not exclude the DOI income from gross income pursuant to sec. 108(a)(1)(B), I.R.C.

Held: The word "assets" as used in sec. 108(d)(3), I.R.C., includes assets exempt from the claims of creditors under applicable State law.

Held, further: Ps are liable for the accuracy-related penalty under sec. 6662(a), I.R.C., to the extent stated herein.

Terry P. Draeger, for petitioners.

Kay Hill, for respondent.

OPINION

CHIECHI, Judge: Respondent determined a deficiency in, and an accuracy-related penalty under section 6662(a)[1] on, petitioners' Federal income tax (tax) for 1993 in the amounts of $14,449 and $2,890, respectively.

The issues remaining for decision are:

(1) Are petitioners entitled to exclude from gross income under section 108(a)(1)(B) discharge of indebtedness (DOI) income in the amount of $42,142? We hold that they are not.

(2) Are petitioners liable for the accuracy-related penalty

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

under section 6662(a)?  We hold that they are to the extent
stated herein.

## Background

This case was submitted fully stipulated.  The facts that
have been stipulated are so found.

Petitioners' mailing address was in Chignik, Alaska, at the
time the petition was filed.

In 1988, petitioner Roderick E. Carlson, whose occupation
during the year at issue was commercial fisherman, and petitioner
Jeanette S. Carlson purchased the fishing vessel Yantari
(Yantari), a 44-foot seiner made of fiber glass that was built in
1982.  They paid $202,451 for that fishing vessel, which included
the engine.  Petitioners financed their purchase of the Yantari
by borrowing money (loan) from Seattle First National Bank (bank
or Seattle First).  As security for that loan, petitioners
granted to the bank a so-called preferred marine mortgage inter-
est (mortgage) in the Yantari.

During 1992, petitioners became delinquent in making pay-
ments to the bank on the loan.  On February 8, 1993, when the
unpaid principal balance of the loan was $137,142, the bank
foreclosed on the Yantari, the Yantari was sold for $95,000 as
part of that foreclosure, the proceeds from that sale were used
to reduce the outstanding principal balance of the loan by
$95,000, and the bank discharged the remaining $42,142 of the

loan.  (For convenience, we shall refer collectively to the bank's foreclosure on the Yantari and the concomitant sale of the Yantari and other events that occurred on February 8, 1993, as the foreclosure sale.)  As a result of the foreclosure sale, petitioners realized capital gain of $28,621 and DOI income of $42,142.

Immediately preceding the foreclosure sale on February 8, 1993, petitioners had (1) assets located in the States of Alaska and Washington which had an aggregate fair market value of $875,251 and (2) liabilities which totaled $515,930.[2]  Included

---

[2]Petitioners' description of petitioners' liabilities immediately preceding the foreclosure sale on Feb. 8, 1993, and the amounts thereof stipulated by the parties are:

| Description of Liability | Amount of Liability |
|---|---|
| Seattle First | $137,142 (principal) |
|  | 23,973 (interest) |
| Washington Mutual | 96,280 |
| HFC (2nd Mortgage) | 61,546 |
| Seattle First | 9,575 |
| Seattle First | 4,196 |
| Seattle First | 11,456 |
| Seattle First Cr. | 4,068 |
| Alaska Airlines | 284 |
| Coastal Trans. | 5,610 |
| Discover | 1,710 |
| Hartig Rhodes | 4,447 |
| HFC Visa | 804 |
| Medden | 1,246 |
| Nordstrom | 806 |
| Bon Marche | 1,855 |
| Guiness Assoc. | 35,100 |
| Security Pacific | 4,319 |
| HFC Charge | 6,941 |
| Household Finance | 2,828 |

(continued...)

in petitioners' assets immediately preceding the foreclosure sale on February 8, 1993, was a so-called Alaska limited entry fishing permit which had a fair market value of $393,400.[3] Petitioners' Alaska limited entry fishing permit was a purse seine permit for the commercial fishing of salmon in the Chignik, Alaska fishery (petitioners' fishing permit).

Petitioners jointly filed Form 1040, U.S. Individual Income Tax Return, for 1993 (petitioners' joint return). In petitioners' joint return, petitioners did not report any gain or loss or any DOI income as a result of the foreclosure sale of the

---

[2](...continued)

| | |
|---|---|
| Washington Mutual | 1,039 |
| I.R.S. | 28,000 |
| Sea Catch | 24,950 |
| ISA | 22,755 |
| Tina Carlson | 25,000 |

[3]The remaining assets included in petitioners' total assets immediately preceding the foreclosure sale on Feb. 8, 1993, and the respective fair market values thereof stipulated by the parties were:

| Asset | Fair Market Value |
|---|---|
| Cash | $ 7,261 |
| Land in Chignik, Alaska | 35,000 |
| F/V Yantari | 95,000 |
| F/V Little One | 1,964 |
| Fish Bldg., Chignik, Alaska | 1,500 |
| Residence, Chignik, Alaska | 150,000 |
| Residence, Edmonton, Wash. | 159,026 |
| 1989 Ford Aerostar | 15,000 |
| 1988 Ford F150 Pickup | 10,000 |
| Personal prop., Chignik, Alaska | 2,100 |
| Office equip., Chignik, Alaska | 2,000 |
| Arabian horse | 3,000 |

Yantari. However, petitioners attached to that return Form 1099-A, Acquisition or Abandonment of Secured Property (Form 1099-A), which the bank issued to petitioners and which showed that, on a date that is not legible,[4] the outstanding principal balance of the loan secured by the Yantari was $137,142. The following was written by hand at the bottom of Form 1099-A that was attached to petitioners' joint return: "Taxpayer Was Insolvent - No Tax Consequence" (written statement).

Respondent timely issued to petitioners a notice of deficiency for 1993 (notice). In the notice, respondent determined, inter alia, to increase petitioners' income by $42,142 for "RELIEF OF DEBT" and by $28,629 for "DISPOSITION OF F/V YANTARNI [sic]". Respondent also determined in the notice to impose an accuracy-related penalty under section 6662(a).

## Discussion

Petitioners bear the burden of proving that the determinations in the notice are erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). That this case was submitted fully stipulated does not change that burden or the effect of a failure of proof. See Rule 122(b); Borchers v. Commissioner, 95 T.C. 82, 91 (1990), affd. 943 F.2d 22 (8th Cir. 1991).

---

[4]Although the date on Form 1099-A is illegible, the parties stipulated that the date for determining discharge of indebtedness income is Feb. 8, 1993.

DOI Income--Section 108

Section 61(a) defines the term "gross income" broadly to mean all income from whatever source derived, including income from discharge of indebtedness.  See sec. 61(a)(12).  Section 108(a) provides certain exceptions to section 61(a)(12).  See Gitlitz v. Commissioner, 531 U.S. __, __, 69 U.S.L.W. 4060, 4062 (Jan. 9, 2001).  As pertinent here, section 108(a)(1)(B) (insolvency exception) excludes from gross income any amount that otherwise would be includable in gross income by reason of the discharge in whole or in part of indebtedness of the taxpayer if the discharge occurs when the taxpayer is insolvent.  The amount of DOI income excluded under section 108(a)(1)(B) is not to exceed the amount by which the taxpayer is insolvent.  See sec. 108(a)(3).  The term "insolvent" is defined in section 108(d)(3) as follows:

> (3) Insolvent.--For purposes of this section [108], the term "insolvent" means the excess of liabilities over the fair market value of assets.  With respect to any discharge, whether or not the taxpayer is insolvent, and the amount by which the taxpayer is insolvent, shall be determined on the basis of the taxpayer's assets and liabilities immediately before the discharge.

The parties' general dispute here is whether, pursuant to section 108(a)(1)(B), petitioners may exclude from gross income for the year at issue $42,142 of DOI income resulting from the foreclosure sale on February 8, 1993.  The parties agree that resolution of that issue depends on whether, immediately before

that foreclosure sale, petitioners were insolvent within the meaning of section 108(d)(3).  The parties' specific dispute here concerns the meaning of the word "assets" as used in section 108(d)(3).

It is petitioners' position that the word "assets" as used in section 108(d)(3) does not include assets that are exempt from the claims of creditors under applicable State law.  In support of that argument, petitioners rely principally on Cole v. Commissioner, 42 B.T.A. 1110 (1940), and Hunt v. Commissioner, T.C. Memo. 1989-335.  According to petitioners, petitioners' fishing permit, which had a fair market value of $393,400 immediately preceding the foreclosure sale on February 8, 1993, is an asset exempt from the claims of creditors under the law of the State of Alaska.[5]  Petitioners maintain that, pursuant to Cole and Hunt,

---

[5]Petitioners also contend that certain other assets, i.e., petitioners' principal residence, petitioners' household goods and wearing apparel, petitioners' tools of the trade, and petitioners' motor vehicle (collectively, petitioners' other assets), are assets exempt from the claims of creditors under applicable State law to the extent of $54,000, $3,000, $2,800, and $3,000, respectively.  According to petitioners, those assets also are not to be included in petitioners' assets in performing the calculation set forth in sec. 108(d)(3) for determining whether petitioners are insolvent (insolvency calculation).  Assuming arguendo that we were to hold that the word "assets" as used in sec. 108(d)(3) does not include assets that are exempt from the claims of creditors under applicable State law and that petitioners' fishing permit is an asset that is exempt from the claims of creditors under the law of the State of Alaska, petitioners would be insolvent within the meaning of sec. 108(d)(3) without regard to whether a total of $62,800 of petitioners' other assets that petitioners claim are exempt from the claims of creditors under

(continued...)

petitioners' fishing permit should be excluded in performing the insolvency calculation under section 108(d)(3).  If the Court were to sustain petitioners' position, the parties agree that petitioners would be insolvent within the meaning of section 108(d)(3) and that the insolvency exception of section 108(a)(1)(B) would exclude from their gross income for the year at issue $42,142 of DOI income resulting from the foreclosure sale on February 8, 1993.

Respondent counters that Cole v. Commissioner, supra, and Hunt v. Commissioner, supra, on which petitioners rely do not apply in the instant case.  According to respondent, the plain meaning of the word "assets", as well as the legislative history of section 108(a)(1)(B), rejects the narrow definition of that word which petitioners proffer.  Respondent argues in the alternative that even if the Court were to sustain petitioners'

---

[5](...continued)
applicable State law are to be excluded in the insolvency calculation under that section.  Conversely, assuming arguendo that we were to hold that the word "assets" as used in sec. 108(d)(3) does not include assets that are exempt from the claims of creditors under applicable State law and that a total of $62,800 of petitioners' other assets are exempt from the claims of creditors under applicable State law, petitioners would not be insolvent within the meaning of sec. 108(d)(3) unless petitioners' fishing permit were exempt from the claims of creditors under applicable State law and were to be excluded in performing the insolvency calculation under that section.  Consequently, we shall address petitioners' argument regarding the meaning of the word "assets" as used in sec. 108(d)(3) in the context solely of petitioners' fishing permit, and not in the context of petitioners' other assets, all of which they claim are exempt from the claims of creditors under applicable State law.

position as to the meaning of the word "assets" as used in section 108(d)(3), petitioners have failed to show that petitioners' fishing permit is in all instances exempt from the claims of creditors under the law of the State of Alaska.

Our function in interpreting the Code is to construe it in a way that will give effect to the intent of Congress. See Merkel v. Commissioner, 109 T.C. 463, 468 (1997), affd. 192 F.3d 844 (9th Cir. 1999). Our starting point in resolving the parties' dispute over the meaning of the word "assets" as used in section 108(d)(3) is the plain meaning of the language used by Congress. See American Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982); Merkel v. Commissioner, 192 F.3d 844, 848 (9th Cir. 1999), affg. 109 T.C. 463 (1997). Where, as is the case here, the statute does not define the word,[6] we generally interpret it by using its ordinary and common meaning. See Merkel v. Commissioner, 192 F.3d at 848 (quoting United States v. Iverson, 162 F.3d 1015, 1022 (9th Cir. 1998)). If the ordinary and common meaning of the statutory language in question supports only one construction,

---

[6]When Congress defined the term "insolvent" in sec. 108(d)(3) to mean the excess of liabilities over the fair market value of assets, it did not provide in sec. 108 a definition of the word "assets" (or the word "liabilities", see Merkel v. Commissioner, 109 T.C. 463, 468 (1997), affd. 192 F.3d 844 (9th Cir. 1999)). Nor does the Code contain any generally applicable definition of the word "assets" (or the word "liabilities", see id.). The regulations promulgated under sec. 108 do not elaborate on the definition of the term "insolvency" in sec. 108(d)(3) and do not define the word "assets" (or the word "liabilities", see id.) used in that definition.

that statutory language is unambiguous.  See id. (quoting California v. Montrose Chem. Corp., 104 F.3d 1507, 1514 (9th Cir. 1997)).  However, where the ordinary and common meaning of the statutory language supports more than one interpretation, the statutory language is ambiguous, and we may consult legislative history to assist us in interpreting the language in question. See Merkel v. Commissioner, 109 T.C. at 468-469.  We are to construe exclusions from income, like section 108(a)(1)(B), narrowly in favor of taxation.  See Merkel v. Commissioner, 192 F.3d at 848 (citing United States v. Centennial Sav. Bank FSB, 499 U.S. 573, 583 (1991); Harbor Bancorp & Subsidiaries v. Commissioner, 115 F.3d 722, 732 (9th Cir. 1997)).

Bearing in mind the foregoing principles of statutory construction, we shall consider initially respondent's contention that the plain meaning of the word "assets" supports only one construction of that word as used in section 108(d)(3).  As pertinent here, the common and ordinary meaning of the word "assets" set forth in Merriam-Webster's Collegiate Dictionary 69 (10th ed. 1996) is:

> 1  pl a : the property of a deceased person subject by law to the payment of his or her debts and legacies b : the entire property of a person, association, corporation, or estate applicable or subject to the payment of debts * * * 3 * * * b pl : the items on a balance sheet showing the book value of property owned

The first and second dictionary definitions of the word "assets" quoted above appear to exclude from that definition assets exempt

from the claims of creditors under applicable State law. That is because under applicable State law such assets generally are not subject to the payment of debts. However, the third dictionary definition of the word "assets" quoted above seems to include assets exempt from the claims of creditors under applicable State law. That is because such assets are items appearing on a balance sheet showing the value of property owned. See Accounting and Fin. Reporting for Personal Fin. Statements, Statement of Position 82-1 (AICPA 1982). We conclude that the common and ordinary meaning of the word "assets" as reflected in the dictionary definition of that word does not support only one construction. We next turn to pertinent legislative history for guidance in interpreting what Congress intended by its use of the word "assets" in the definition of the term "insolvent" in section 108(d)(3).

Congress enacted section 108(a)(1)(B) and related provisions (i.e., section 108(a)(3), (d)(3), and (e)(1)) into the Code in 1980 as part of the Bankruptcy Tax Act of 1980, Pub. L. 96-589, sec. 2(a), 94 Stat. 3389 (1980 Bankruptcy Tax Act). The stated purpose of the 1980 Bankruptcy Tax Act was to "accommodate bankruptcy policy and tax policy." S. Rept. 96-1035 at 9-10 (1980), 1980-2 C.B. 620, 624. Such an accommodation was necessary after Congress made significant changes to the Federal bankruptcy laws in 1978 by passing the Bankruptcy Reform Act of

1978, Pub. L. 95-598, 92 Stat. 2549 (1978 Bankruptcy Reform Act), which enacted title 11 into the United States Code (title 11). In passing the 1980 Bankruptcy Tax Act, Congress "intended to complete the process of revising and updating Federal bankruptcy laws by providing rules governing the tax aspects of bankruptcy and related tax issues."  Staff of Joint Comm. on Taxation, Description of H.R. 5043 (Bankruptcy Tax Act of 1980) as Passed by the House, at 3 (J. Comm. Print 1980).  Both the Senate and House reports accompanying H.R. 5043, 96th Cong., 2d Sess. (1980) (H.R. 5043), which became the 1980 Bankruptcy Tax Act, indicate that the proposed insolvency exception in section 108(a)(1)(B) was intended to ensure that an insolvent debtor outside of bankruptcy (like a debtor coming out of bankruptcy who is accorded a "fresh start" under the Federal bankruptcy laws) is not to be burdened with an immediate tax liability.  See S. Rept. 96-1035, supra, 1980-2 C.B. at 624; H. Rept. 96-833, at 9 (1980).

The committee reports accompanying H.R. 5043 describe in pertinent part the tax law governing DOI income that was extant at the time Congress passed the 1980 Bankruptcy Tax Act, as follows:

> Under present law, income is realized when indebtedness is forgiven or in other ways cancelled (sec. 61(a)(12) of the Internal Revenue Code).  For example, if a corporation has issued a $1,000 bond at par which it later repurchases for only $900, thereby increasing its net worth by $100, the corporation realizes $100 of income in the year of repurchase (United States v. Kirby Lumber Co., 284 U.S. 1 (1931)).

There are several exceptions to the general rule of income realization.  Under a judicially developed "insolvency exception," no income arises from discharge of indebtedness if the debtor is insolvent both before and after the transaction;[1] and if the transaction leaves the debtor with assets whose value exceeds remaining liabilities, income is realized only to the extent of the excess.[2] * * *

[1]Treas. Regs. § 1[.]61-12(b)(1); Dallas Transfer & Terminal Warehouse Co. v. Comm'r, 70 F.2d 95 (5th Cir. 1934).
[2]Lakeland Grocery Co., 36 B.T.A. 289 (1937).

S. Rept. 96-1035, supra, 1980-2 C.B. at 623; see H. Rept. 96-833, supra at 7.

We shall discuss in greater detail the three cases referred to in the foregoing excerpt of the committee reports accompanying H.R. 5043.  In United States v. Kirby Lumber Co., 284 U.S. 1 (1931), the Supreme Court of the United States (Supreme Court) established the rule that a debtor realizes (and must recognize) income when discharged of indebtedness, i.e., when relieved of indebtedness without full payment of the amount owed.  In Kirby Lumber Co., the taxpayer had issued bonds for which it received par value.  In the same year, the taxpayer repurchased some of those bonds in the open market for less than their par value issue price.  See id. at 2.  The Supreme Court held that the taxpayer must recognize income in an amount (i.e., $137,521.30) equal to the difference between the issue price and the repurchase price of the bonds in question.  See id. at 2, 3.  In so holding, the Supreme Court reasoned:  "As a result of its [tax-

payer's] dealings it made available $137,521.30 [of] assets previously offset by the obligation of bonds now extinct." Id. at 3.

Several years after the Supreme Court decided Kirby Lumber Co., the U.S. Court of Appeals for the Fifth Circuit distinguished that case and established an insolvency exclusion to the rule that the Supreme Court had announced in that case. See Dallas Transfer & Terminal Warehouse Co. v. Commissioner, 70 F.2d 95 (5th Cir. 1934), revg. 27 B.T.A. 651 (1933). In Dallas Transfer & Terminal Warehouse Co., the taxpayer was relieved of indebtedness as the lessee of certain real property with respect to unpaid rent and other bills totaling $107,881 when it conveyed to the lessor of that property certain real property of lesser value (i.e., $42,507) in which the taxpayer's equity at the time of conveyance was $17,507. See id. The Court of Appeals held that the taxpayer did not realize income as a result of that transaction. See id. at 96. In so holding, the Court of Appeals stated:

> In effect the transaction was similar to what occurs in an insolvency or bankruptcy proceeding when, upon a debtor surrendering, for the benefit of his creditors, property insufficient in value to pay his debts, he is discharged from liability for his debts. This does not result in the debtor acquiring something of exchange-able value in addition to what he had before. There is a reduction or extinguishment of liabilities without any increase of assets. There is an absence of such a gain or profit as is required to come within the accepted definition of income. * * * It hardly would be contended that a discharged insolvent or bankrupt

receives taxable income in the amount by which his provable debts exceed the value of his surrendered assets. * * *

Id. The Court of Appeals distinguished United States v. Kirby Lumber Co., supra, as follows:

The instant case is substantially different from the [Kirby Lumber Co.] case * * *. In the last-mentioned case a corporation issued its bonds at par and in the same year repurchased some of them at less than par. The taxpayer's [Kirby Lumber Co.'s] assets having been increased by the cash received for the bonds, by the repurchase of some of those bonds at less than par the taxpayer, to the extent of the difference between what it received for those bonds and what it paid in repurchasing them, had an asset which had ceased to be offset by any liability, with a result that after that transaction the taxpayer had greater assets than it had before. The decision [Kirby Lumber Co.] * * * that the increase in clear assets so brought about constituted taxable income is not applicable to the facts of the instant case, as the cancellation of the respondent's [Dallas Transfer & Terminal Warehouse Co.'s] past due debt to its lessor did not have the effect of making the respondent's assets greater than they were before that transaction occurred. * * *

Dallas Transfer & Terminal Warehouse Co. v. Commissioner, supra at 96.

In Lakeland Grocery Co. v. Commissioner, 36 B.T.A. 289 (1937), the Board of Tax Appeals (Board) considered the insolvency exclusion established by Dallas Transfer & Terminal Warehouse Co. v. Commissioner, supra. In Lakeland Grocery Co., the taxpayer entered into a so-called composition settlement under which the taxpayer paid its creditors $15,473 in consideration of being relieved of its indebtedness to those creditors in the amount of $104,710. Prior to entering into the composition

settlement, the taxpayer was insolvent.  After that settlement, the taxpayer had net assets of $39,597, which, as noted by the Board, "were freed from the claims of creditors as a result of the * * * [discharge of indebtedness]."  Lakeland Grocery Co. v. Commissioner, supra at 291.  The Board distinguished Dallas Transfer & Terminal Warehouse Co. v. Commissioner, supra, from the facts before it and concluded that the rationale of United States v. Kirby Lumber Co., 284 U.S. 1 (1931), was applicable to those facts.  See Lakeland Grocery Co. v. Commissioner, supra at 291-292.  The Board held that the taxpayer realized gain to the extent of the value of the assets freed from the claims of its creditors, i.e., to the extent it had assets (i.e., $39,597) which ceased to be offset by any liability.  See id. at 292.

We recently had occasion in Merkel v. Commissioner, 109 T.C. 463 (1997), to review the three cases (United States v. Kirby Lumber Co., supra, Dallas Transfer & Terminal Warehouse Co. v. Commissioner, supra, and Lakeland Grocery Co. v. Commissioner, supra) to which the committee reports accompanying H.R. 5043 refer and which we discuss above.  In Merkel, as here, we had to determine whether a debtor qualified for the insolvency exception in section 108(a)(1)(B).  However, in order to resolve that issue in Merkel, we had to determine the meaning of the word "liabilities" as used in the definition of the term "insolvent" in section 108(d)(3).  See Merkel v. Commissioner, supra at 466-467.

We observed in <u>Merkel</u>:

> The Board's approach to a taxpayer in financial distress being discharged of an indebtedness, which approach was crystallized in <u>Lakeland Grocery Co. v. Commissioner</u>, <u>supra</u>, has been called, among other things, the "net assets" test. That test is based on the so-called freeing-of-assets theory derived from the Supreme Court's statement in <u>Kirby Lumber</u> that the transaction "made available $137,521.30 assets previously offset by the obligation of bonds now extinct". * * * The net assets test is a corollary of the principle in <u>Dallas Transfer</u> that an insolvent debtor does not realize income when discharged of indebtedness. Under the net assets test, if the debtor remains insolvent (liabilities exceed assets) after being discharged of indebtedness, no assets have been freed as a result of the discharge since the debtor's assets are still more than offset by his postdischarge liabilities, and, thus, no gross income is realized; if the debtor is solvent (assets exceed liabilities) after being discharged, then the discharge has freed the debtor's assets from the offset of his liabilities to that extent, and, thus, gross income is realized from the discharge. In essence, the net assets test is simply an examination of the debtor's net worth after he is discharged of indebtedness--an increase in net worth gives rise to income, but a decrease in negative net worth does not.

<u>Id.</u> at 472-473; fn. ref. omitted.

We explained in <u>Merkel</u> that Congress

> codified the net assets test in section 108(a)(1)(B), (a)(3), and (d)(3) as a means of determining an <u>exclusion</u> from gross income of an item of income derived from the discharge of indebtedness. Aside from the parallel descriptions in the committee reports of the preexisting law and of the proposed insolvency exclusion, * * * that codification is apparent from the statutory insolvency calculation coupled with the insolvency exclusion limitation provided in section 108(a)(3), which together share the same underlying analytical framework as the net assets test. That framework requires an examination of the debtor's assets and liabilities for the purpose of determining whether the debtor's net worth turns positive (assets

exceed liabilities), i.e., whether assets are freed, as a result of the debtor's being discharged of indebtedness.

* * * * * * *

From our examination of the statutory language, the legislative history, and the relevant cases cited in the committee reports, we conclude that the analytical framework of the insolvency exclusion and its related provisions [in section 108] is based on the freeing-of-assets theory. * * *

A solvent debtor is capable of meeting his financial obligations because his assets equal or exceed his liabilities.  That excess (if any) is not increased when an obligation that offsets assets is paid in full because the reduction in liabilities is equal to the reduction in assets.  If the reduction in liabilities exceeds the reduction in assets, then, under the freeing-of-assets theory, the solvent debtor has realized a gain to the extent of that excess. * * * Pursuant to the freeing-of-assets theory, a debtor does not realize income when discharged of a particular indebtedness, however, if his postdischarge liabilities equal or exceed his postdischarge assets (if any); i.e., under the net assets test, the debtor's liabilities equal or exceed his assets after the discharge (or, the statutory insolvency calculation shows that the debtor is insolvent by an amount greater than or equal to the discharge of indebtedness income * * *

Id. at 473-475; fn. ref. omitted.

With the foregoing in mind, we shall now consider petitioners' argument that we follow Cole v. Commissioner, 42 B.T.A. 1110 (1940), in defining the word "assets" as used in the definition of the term "insolvent" in section 108(d)(3).[7]  In Cole, the

---

[7]Petitioners also urge us to follow Hunt v. Commissioner, T.C. Memo. 1989-335.  Petitioners argue that we previously held in Hunt that, for purposes of sec. 108(a)(1)(B), the word "assets" in sec. 108(d)(3) does not include assets exempt from the

(continued...)

Board began its analysis by acknowledging that under <u>Lakeland Grocery Co. v. Commissioner</u>, 36 B.T.A. 289 (1937), the taxpayer, a resident of New York, would realize income upon the discharge of his indebtedness "to the extent of the excess of total assets over total liabilities immediately after * * * [discharge]." <u>Cole v. Commissioner</u>, <u>supra</u> at 1112. In determining whether there was such an excess, the Board stated:

> In determining the amount in [sic] which peti-
> tioner's net assets were increased as a result of the
> cancellation of petitioner's indebtedness by his credi-
> tor, i.e., the amount of petitioner's assets which
> ceased to be offset by claims of creditors, there
> should be, and has been, omitted from the value of
> petitioner's assets the value of his equity in ten life
> insurance policies. * * *

---

[7](...continued)
claims of creditors under applicable State law. We reject that argument and petitioners' characterization of <u>Hunt</u> as a case decided under sec. 108(a)(1)(B). <u>Hunt</u> involved tax year 1980. The insolvency exception in sec. 108(a)(1)(B) that was enacted into the Code as part of the 1980 Bankruptcy Tax Act became effective for transactions occurring after Dec. 31, 1980. See 1980 Bankruptcy Tax Act, Pub. L. 96-589, sec. 7(a)(1), 94 Stat. 3411. Although in certain circumstances Congress made available to debtors in bankruptcy cases or similar judicial proceedings an election to substitute Sept. 30, 1979, as the effective date of the 1980 Bankruptcy Tax Act, see <u>id.</u> at sec. 7(f)(1), there is no indication in <u>Hunt</u> that the taxpayers involved there made such an election, see <u>Hunt v. Commissioner</u>, <u>supra</u>. Our discussion in <u>Hunt</u> of sec. 108 as amended by the 1980 Bankruptcy Tax Act (amended sec. 108) is dictum and appears in <u>Hunt</u> after we re-solved the issue presented to us with respect to DOI income under the tax law that was extant prior to the passage of the 1980 Bankruptcy Tax Act. See <u>Hunt v. Commissioner</u>, <u>supra</u>. In this connection, it is noteworthy that we began our discussion of amended sec. 108 in <u>Hunt</u> by stating: "Furthermore, the correct-ness of our result is reinforced by the language of [amended] section 108." <u>Id.</u>

Id. at 1113.  The Board explained in Cole that it excluded the value of the taxpayer's equity in certain life insurance policies from its determination of the value of the taxpayer's assets because "Under the applicable law of New York * * * such equity in insurance was free from claims of creditors."  Id.

We reject petitioners' argument that we apply Cole in this case.  When Congress enacted the insolvency exception into the Code as section 108(a)(1)(B), one of the related provisions it also enacted is section 108(e)(1).[8]  Section 108(e)(1) provides that, for purposes of title 26 of the United States Code (i.e., the Internal Revenue Code, including section 61(a)(12)), "there shall be no insolvency exception from the general rule that gross income includes income from the discharge of indebtedness" except as provided in section 108(a)(1)(B).  As the Supreme Court

---

[8]When Congress "codified the net assets test in section 108(a)(1)(B), (a)(3), and (d)(3)," Merkel v. Commissioner, 109 T.C. at 473, it codified the net assets test developed by Dallas Transfer & Terminal Warehouse Co. v. Commissioner, 70 F.2d 95 (5th Cir. 1934), revg. 27 B.T.A. 651 (1933), and Lakeland Grocery Co. v. Commissioner, 36 B.T.A. 289 (1937).  It did not codify the application of the net assets test by Cole v. Commissioner, 42 B.T.A. 1110 (1940).  The committee reports accompanying H.R. 5043 make no reference to and do not describe the holding of Cole, whereas those reports do refer to and describe the holdings of Dallas Transfer & Terminal Warehouse Co. and Lakeland Grocery Co. Nor do those committee reports refer to the two cases that applied Cole v. Commissioner, supra, which had been decided as of the time Congress passed the 1980 Bankruptcy Tax Act, i.e., Davis v. Commissioner, 69 T.C. 814, 833-834 (1978), and Estate of Marcus v. Commissioner, T.C. Memo. 1975-9.  See also Babin v. Commissioner, T.C. Memo. 1992-673, affd. on other grounds 23 F.3d 1032 (6th Cir. 1994); Hunt v. Commissioner, supra, decided after Congress passed that Act.

very recently stated, "Section 108(e)[(1)] precludes us from relying on any understanding of the judicial insolvency exception that was not codified in §108." Gitlitz v. Commissioner, 531 U.S. at __, 69 U.S.L.W. at 4063. Even before Gitlitz was decided, we reached a similar conclusion in Merkel v. Commissioner, 109 T.C. 463 (1997). We stated in pertinent part:

> As Congress enacted the insolvency exclusion [section 108(a)(1)(B)], it eliminated the net assets test as a judicially created exception to the general rule of income from the discharge of indebtedness. See sec. 108(e)(1). The fundamental difference between the insolvency exclusion [in section 108(a)(1)(B)] and the [judicially developed] net assets test is that the insolvency exclusion is applicable only if there exists income from the discharge of indebtedness, whereas the net assets test engages in the threshold inquiry. Therefore, unlike the net assets test, the insolvency exclusion does not necessarily invade the province of section 61(a)(12).
>
> Essentially, the insolvency exclusion defers to section 61(a)(12) as to the definition of the term "gross income", but represents a policy judgment that certain of that income should not give rise to an immediate tax liability. The relevant committee reports intimate that the policy judgment underlying the insolvency exclusion serves a humanitarian purpose--to avoid burdening an insolvent debtor outside of bankruptcy with an immediate tax liability. * * *

Merkel v. Commissioner, supra at 481-482; fn. ref. omitted.

We conclude that section 108(e)(1) precludes in this case (or in any other case involving the insolvency exception in section 108(a)(1)(B)) the application of Cole v. Commissioner, supra, and any other judicially developed insolvency exception to the general rule of section 61(a)(12) that gross income includes

income from the discharge of indebtedness.  See <u>Gitlitz v. Commissioner</u>, <u>supra</u> at ___, 69 U.S.L.W. at 4063; <u>Merkel v. Commissioner</u>, <u>supra</u> at 481.

Our conclusion that <u>Cole v. Commissioner</u>, 42 B.T.A. 1110 (1940), has no application in the instant case not only carries out the directive of section 108(e)(1), it also carries out the intention of Congress in enacting section 108(d)(3) that assets exempt from the claims of creditors under applicable State law are not to be excluded in determining the fair market value of a taxpayer's assets for purposes of ascertaining whether the taxpayer is insolvent within the meaning of section 108(d)(3). Congress' intention is disclosed by an examination of section 108(d)(3) together with the 1978 Bankruptcy Reform Act and its legislative history and the 1980 Bankruptcy Tax Act and its legislative history.  One of the stated policies of the 1978 Bankruptcy Reform Act was "to provide a fresh start", S. Rept. 95-989, at 6 (1978), for debtors coming out of bankruptcy.  The principal mechanism adopted by Congress in the 1978 Bankruptcy Reform Act for providing such a "fresh start" in the Federal bankruptcy laws is through the discharge of debts.[9]  See <u>id.</u> at 98.

---

[9]The discharge-of-debt provisions of the 1978 Bankruptcy Reform Act, Pub. L. 95-598, sec. 727, 92 Stat. 2609, are described in the accompanying Senate report as "the heart of the fresh start provisions of the bankruptcy law".  S. Rept. 95-989, at 7, 98 (1978).

Congress also adopted another method in the 1978 Bankruptcy Reform Act for providing a "fresh start" to debtors coming out of bankruptcy, namely, allowing debtors in bankruptcy to retain after bankruptcy certain property classified as exempt property for purposes of title 11 (title 11 exempt property), which includes property exempt from the claims of creditors under applicable State law.  See 1978 Bankruptcy Reform Act, Pub. L. 95-598, sec. 522(b)(2)(A), 92 Stat. 2549, 2586, 11 U.S.C. sec. 522(b)(2)(A) (Supp. II, 1978);[10] see also S. Rept. 95-989, supra at 6.  The role of title 11 exempt property in the Federal bankruptcy laws is evidenced by, for example, the definition of the term "insolvent" for purposes of title 11 that Congress adopted in section 101(26) of the 1978 Bankruptcy Reform Act, 92

_____

[10]Although there have been amendments to 11 U.S.C. sec. 522(b) as originally enacted that were in effect for the year at issue, those amendments are not material to a resolution of the issue presented here under sec. 108.  See 11 U.S.C. sec. 522(b) (1994).

Stat. 2553, 11 U.S.C. sec. 101(26) (Supp. II, 1978).[11]  In deter

---

[11]Sec. 101(26) of the 1978 Bankruptcy Reform Act provides:

(26) "insolvent" means--

(A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of--

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the [bankruptcy] estate under section 522 of this title; * * *

1978 Bankruptcy Reform Act, sec. 101(26), 92 Stat. 2549, 11 U.S.C. sec. 101(26) (Supp. II, 1978).  Although there have been amendments to sec. 101(26) of title 11 as originally enacted that were in effect for the year at issue, those amendments are not material to a resolution of the issue presented here under sec. 108.  See 11 U.S.C. sec. 101(32) (1994).

Sec. 522(b) of the 1978 Bankruptcy Reform Act, 92 Stat. 2586, 11 U.S.C. sec. 522(b) (Supp. II, 1978), which allows a debtor in bankruptcy to exclude exempt title 11 property from property of the debtor's bankruptcy estate, provides:

(b) Notwithstanding section 541 of this title, an individual debtor may exempt from property of the [bankruptcy] estate either--

(1) property that is specified under subsection (d) of this section, unless the State law that is applicable to the debtor under paragraph (2)(A) of this subsection specifically does not so authorize; or, in the alternative,

(2)(A) any property that is exempt under Federal law, other than subsection (d) of this section, or State or local law that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been

(continued...)

mining whether a debtor in bankruptcy is insolvent for purposes of title 11, the debtor's title 11 exempt property, which includes property exempt from the claims of creditors under applicable State law, is excluded from the property he otherwise owns. See 1978 Bankruptcy Reform Act, sec. 101(26), 11 U.S.C. sec. 101(26) (Supp. II, 1978).

When it passed the 1980 Bankruptcy Tax Act, Congress was aware of the role that it had decided to give title 11 exempt property in the 1978 Bankruptcy Reform Act. In particular, when Congress enacted into the Code the insolvency exception in section 108(a)(1)(B) and the definition of "insolvent" in section 108(d)(3), it knew that it had decided to, and did, define the term "insolvent" in section 101(26) of the 1978 Bankruptcy Reform Act, 11 U.S.C. sec. 101(26) (Supp. II, 1978), to exclude specifi-

---

[11](...continued)
        located for the 180 days immediately preceding the
        date of the filing of the petition, or for a lon-
        ger portion of such 180-day period than in any
        other place; and

            (B) any interest in property in which the
        debtor had, immediately before the commencement of
        the case, an interest as a tenant by the entirety
        or joint tenant to the extent that such interest
        as a tenant by the entirety or joint tenant is
        exempt from process under applicable nonbankruptcy
        law.

Sec. 541 of the 1978 Bankruptcy Reform Act, 92 Stat. 2594,
governs the creation and composition of the bankruptcy estate.
Sec. 522(d) of the 1978 Bankruptcy Reform Act, 92 Stat. 2586,
identifies 11 categories of property, each of which is considered
title 11 exempt property.

cally title 11 exempt property of a debtor in bankruptcy, including property exempt from the claims of creditors under applicable State law, in determining whether that debtor is insolvent for purposes of the Federal bankruptcy laws. See S. Rept. 96-1035 at 24 (1980), 1980-2 C.B. 620, 632.[12] However, Congress decided to, and did, adopt a different definition of the term "insolvent" in section 108(d)(3) for purposes of section 108. Unlike the definition of the term "insolvent" in section 101(26) of the 1978 Bankruptcy Act, 11 U.S.C. sec. 101(26) (Supp. II, 1978), which Congress adopted for purposes of the Federal bankruptcy laws, the definition of that term which Congress adopted for purposes of section 108 does not specifically exclude assets of a debtor that are exempt from the claims of creditors under applicable State law or any other title 11 exempt property in determining whether the debtor is insolvent. We conclude that the decision of

---

[12]The Senate report accompanying the 1980 Bankruptcy Tax Act states in pertinent part:

> Under bankruptcy law, the commencement of a liquidation or reorganization case involving an individual debtor creates an "estate" which consists of property formerly belonging to the debtor. The bankruptcy estate generally is administered by a trustee for the benefit of creditors, and it may derive its own income and incur expenditures. At the same time, the individual is given a "fresh start"--that is, wages earned by the individual after commencement of the case and after-acquired property do not become part of the bankruptcy estate, but belong to the individual, and certain property may be set aside as exempt.

S. Rept. 96-1035 at 24 (1980), 1980-2 C.B. 620, 632.

Congress not to define the term "insolvent" in section 108(d)(3) to exclude specifically such exempt assets in determining whether a debtor is insolvent for purposes of section 108 was intentional.[13]  We further conclude that Congress did not intend to exclude assets exempt from the claims of creditors under applicable State law from a taxpayer's assets for purposes of determining whether the taxpayer is insolvent within the meaning of section 108(d)(3).  If Congress had intended to exclude such exempt assets from a taxpayer's assets in determining whether the taxpayer is insolvent for purposes of section 108, Congress would have so stated in section 108(d)(3).  It did not.

Our conclusion that Cole v. Commissioner, 42 B.T.A. 1110 (1940), has no application in the instant case also leads to a result that comports with the intention of Congress in enacting

---

[13]In this regard, Myron M. Sheinfeld (Mr. Sheinfeld), a witness who testified at the Congressional hearings on H.R. 5043 as passed by the House of Representatives (House), see H.R. 5043, 96th Cong., 1st Sess. (1979), pointed out at those hearings that the definition of "insolvent" in H.R. 5043 as passed by the House was different from the definition of that term in title 11 and that "the differing definitions of insolvent will, unless made consistent, cause substantial trouble and litigation."  Hearings on H.R. 5043 Before the Subcomm. on Select Revenue Measures of the House Comm. on Ways and Means (Hearings on H.R. 5043), 96th Cong., 1st Sess. 41 (1979) (statement of Myron M. Sheinfeld, Chairman, Committee on Tax Matters, National Bankruptcy Conference).  Mr. Sheinfeld recommended that Congress adopt as the definition of the term "insolvent" in the final version of H.R. 5043 the same definition of the term "insolvent" that Congress had adopted in sec. 101(26) of the 1978 Bankruptcy Reform Act, 11 U.S.C. sec. 101(26) (Supp. II, 1978).  See Hearings on H.R. 5043, supra at 43.  Congress chose not to do so.

section 108(a)(1)(B) and related provisions into the Code.  As we

explained in <u>Merkel v. Commissioner</u>, 109 T.C. at 475,

> Congress' indicated purpose of not burdening an insol-
> vent debtor outside of bankruptcy with an immediate tax
> liability, * * *, together with the operation of the
> insolvency exclusion [section 108(a)(1)(B)] and its
> limitation under section 108(a)(3), in accordance with
> the statutory insolvency calculation [section
> 108(d)(3)], suggest that Congress intended to make a
> debtor's <u>ability to pay an immediate tax</u> on income from
> discharge of indebtedness the controlling factor in
> determining whether a tax burden is imposed. * * *
>
> Ability to pay an immediate tax (i.e., the statu-
> tory notion of insolvency) is a question of fact
> * * * .

Although an asset of a debtor may be exempt from the claims

of creditors under applicable State law, if that asset and the

debtor's other assets exceed the debtor's liabilities, the debtor

has the ability to pay an immediate tax on income from discharged

indebtedness.  In the instant case, immediately preceding the

foreclosure sale on February 8, 1993, the aggregate fair market

value of petitioners' assets was $875,251, which included peti-

tioners' fishing permit valued at $393,400 that they claim is

exempt from the claims of creditors under the law of the State of

Alaska.  At that time, petitioners' liabilities totaled $515,930.

On the record before us, we find that petitioners had the "<u>abil-

ity to pay an immediate tax</u> on", <u>id.</u>, the $42,142 of DOI income

resulting from the foreclosure sale in question.[14]  Requiring

---

[14]Not only did petitioners have the ability to pay an imme-
(continued...)

petitioners to include that income in their gross income for the year at issue and pay a tax thereon is a result that is consistent with the intention of Congress in enacting section 108(a)(1)(B) and related provisions into the Code.

We hold that the word "assets" as used in the definition of the term "insolvent" in section 108(d)(3) includes assets exempt from the claims of creditors under applicable State law.[15]  The

_____

[14](...continued)
diate tax on the DOI income at issue, petitioners' fishing permit is subject to lien and levy by respondent to pay that tax.  See secs. 6321, 6331.  In this regard, apparently there has been some dispute between the State of Alaska and the Internal Revenue Service as to whether permits like petitioners' fishing permit constitute property or a right to property for purposes of secs. 6321 and 6331.  See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3445(c)(2), 112 Stat. 763; 144 Cong. Rec. S4518 (daily ed. May 7, 1998) (statement of Sen. Stevens) ("The State of Alaska has never conceded that these permits are property that may be seized by IRS.  Yet, the IRS seizes them".).  However, in the instant case, the parties stipulated that petitioners' fishing permit is an asset (i.e., property).

In addition, it is noteworthy that, effective Aug. 1, 2000, petitioners may obtain a loan in an amount which does not exceed $30,000, see Alaska Stat. sec. 16.10.310 (Lexis 2000), and which is secured by petitioners' fishing permit in order "to satisfy past due federal tax obligations that may result in the execution on and involuntary transfer of [that permit]".  Alaska Stat. sec. 16.10.310(a)(1)(A)(iii) (Lexis 2000).

[15]Assuming arguendo that we had found that the word "assets" as used in sec. 108(d)(3) does not include assets exempt from the claims of creditors under applicable State law, we nonetheless find on the record before us that petitioners have failed to establish that petitioners' fishing permit qualifies in all instances as such an asset.  On brief, petitioners rely on Alaska Stat. sec. 09.38.015(a)(8) (Lexis 2000), and on Alaska Stat. sec. 16.43.150(g) (Lexis 2000), to show that petitioners' fishing

(continued...)

parties agree that if we were to so hold, petitioners would not be "insolvent" within the meaning of section 108(d)(3), and the insolvency exception of section 108(a)(1)(B) would not apply to the $42,142 of DOI income resulting from the foreclosure sale in question. Consequently, we sustain respondent's determination to include that DOI income in petitioners' gross income for the year at issue.

## Accuracy-Related Penalty--Section 6662

Respondent determined that petitioners are liable for the year at issue for the accuracy-related penalty under section

---

[15](...continued)
permit is exempt from creditors' claims under the laws of the State of Alaska. Petitioners are correct that Alaska Stat. sec. 09.38.015(a)(8) (Lexis 2000) generally exempts limited entry fishing permits like petitioners' fishing permit from the claims of creditors. See also Alaska Stat. sec. 09.38.500(5) (Lexis 2000). In addition, Alaska Stat. sec. 16.43.150(g)(1) (Lexis 2000) provides that such permits cannot be "pledged, mortgaged, leased, or encumbered in any way", except as specifically pro- vided in certain enumerated sections of the Alaska statutes. However, petitioners fail to indicate that limited entry fishing permits, like petitioners' fishing permit, are not exempt from creditors' claims under Alaska law for all purposes and that such permits may be used to secure a loan for the payment of past due Federal tax obligations. For example, petitioners do not discuss the effect of Alaska Stat. sec. 09.38.065 (Lexis 2000), which allows under certain circumstances creditors to make claims against certain assets that are generally exempt from creditors' claims under certain provisions of the Alaska statutes. In addition, petitioners do not mention that petitioners' fishing permit is subject to lien and levy by respondent. See supra n.14. Nor do petitioners address the effect of recently enacted legislation in Alaska that allows petitioners to obtain a loan in an amount not exceeding $30,000, secured by petitioners' fishing permit, in order to pay their past due Federal tax liabilities that may result in the execution on and involuntary transfer of petitioners' fishing permit. See supra n.14.

6662(a). In the notice and on brief, respondent asserted two alternative grounds for the imposition of that penalty: A substantial understatement of income tax under section 6662(b)(2) and negligence under section 6662(b)(1).

Respondent concedes that if the Court were to hold that petitioners must recognize the DOI income at issue, the accuracy-related penalty should not be imposed on that portion of the underpayment of tax attributable to that income. That is because respondent takes the position that petitioners made an adequate disclosure under section 6662(d)(2)(B)(ii)(I) and that they had a reasonable basis under section 6662(d)(2)(B)(ii)(II) for their treatment of such income in petitioners' joint return.

Petitioners concede that the accuracy-related penalty should be imposed on the remaining portion of the underpayment of tax except to the extent it relates to the capital gain that they concede on brief they realized and must recognize as a result of the foreclosure sale of the Yantari (petitioners' capital gain). With respect to the accuracy-related penalty relating to the portion of the underpayment of tax attributable to petitioners' capital gain, petitioners contend that

> Petitioners made the same disclosure as it applies to the gain on sale as to the gain on forgiveness of debt. If taxpayer, without having the ability of hindsight, had believed the vessel only had a value of $60,000, the gain from the deemed sale would be $0.00 and the gain from the discharge of indebtedness would have correspondingly increased from $35,000 to $77,000. The same disclosure Petitioners made with respect to the

> disclosure of indebtedness issue, which was adequate for that issue, also applies to the capital gain from the same transaction.
>
> *       *       *       *       *       *       *
>
> The Petitioners adequately disclosed their position by indicating that the entire debt forgiveness should not be recognized due to Petitioners' insolvency.  In Petitioners' calculation, there was no capital gain, only gain from the discharge of indebtedness. * * *

As we understand petitioners' position with respect to the accuracy-related penalty relating to the underpayment of tax attributable to petitioners' capital gain, they advance two separate contentions.  First, petitioners maintain that they made adequate disclosure under section 6662(d)(2)(B)(ii)(I) regarding that gain by attaching Form 1099-A to petitioners' joint return and writing thereon "Taxpayer Was Insolvent – No Tax Consequence".  Second, petitioners maintain that they did not know that the value of the Yantari when it was sold at the foreclosure sale was $95,000, and consequently they did not know that there was a gain on that sale.  According to petitioners, they therefore had a reasonable basis for, and were not negligent in, failing to report petitioners' capital gain in petitioners' joint return.

Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the underpayment of tax resulting from, inter alia, a substantial understatement of income tax, see section 6662(b)(2), or negligence or disregard of rules or regulations,

see section 6662(b)(1).  The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, such portion.  See sec. 6664(c)(1).

An understatement is equal to the excess of the amount of tax required to be shown in the tax return over the amount of tax shown in the tax return, see sec. 6662(d)(2)(A), and is substantial in the case of an individual if it exceeds the greater of 10 percent of the tax required to be shown or $5,000, see sec. 6662(d)(1)(A).  However, the amount of such understatement is to be reduced by that portion of the understatement which is attributable to any item where (1) "the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return," sec. 6662(d)(2)(B)(ii)(I) (adequate disclosure), and (2) "there is a reasonable basis for the tax treatment of such item by the taxpayer", sec. 6662(d)(2)(B)(ii)(II) (reasonable basis).

For purposes of section 6662(a), the term "negligence" includes any failure to make a reasonable attempt to comply with the Code, and the term "disregard" includes any careless, reckless, or intentional disregard.  See sec. 6662(c).  Negligence has also been defined as a lack of due care or failure to do what a reasonable person would do under the circumstances.  See

Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992),
affg. T.C. Memo. 1991-179; Antonides v. Commissioner, 91 T.C.
686, 699 (1988), affd. 893 F.2d 656 (4th Cir. 1990).

We turn first to petitioners' position with respect to
respondent's determination under section 6662(a) and (b)(2).  On
the record before us, we find that petitioners have failed to
establish that they adequately disclosed in petitioners' joint
return or in any statement attached to that return the relevant
facts affecting the tax treatment of petitioners' capital gain,
as required by section 6662(d)(2)(B)(ii)(I).  For example, there
are no facts disclosed either in that return or in a statement
attached to that return regarding the foreclosure sale of the
Yantari, the amount realized on that sale, or petitioners' basis
in the Yantari.

We further find on the instant record that petitioners have
failed to show that they had a reasonable basis for their failure
to report petitioners' capital gain in petitioners' joint return,
as required by section 6662(d)(2)(B)(ii)(II).  As noted above, as
we understand their position, petitioners contend that they did
not know that the value of the Yantari when it was sold at the
foreclosure sale was $95,000.  Apparently, petitioners maintain
that they believed that the value of the Yantari at that time was
less than $95,000, although they did not disclose in petitioners'
joint return, and they do not indicate on brief, what they

determined that value to be.  Nonetheless, according to petition-
ers, "there was no capital gain" when the Yantari was sold at the
foreclosure sale.  We reject petitioners' position.  It is well
established that, absent clear and convincing proof to the
contrary, the sale price of property at a foreclosure sale is
presumed to be its fair market value.  See, e.g., Frazier v.
Commissioner, 111 T.C. 243, 246 (1998); Community Bank v. Commis-
sioner, 79 T.C. 789, 792 (1982), affd. 819 F.2d 940 (9th Cir.
1987).  Petitioners have presented no evidence, let alone clear
and convincing evidence, that the $95,000-sale price of the
Yantari at the foreclosure sale was not its fair market value.

Furthermore, section 1001(a) provides that gain from a sale
or other disposition of property is the excess of the amount
realized therefrom over the adjusted basis provided in section
1011 for determining gain.  The regulations under section 1001
provide guidance to taxpayers in applying section 1001(a) to
facts that are analogous to the facts presented in the instant
case.  Example (8) of section 1.1001-2(c), Income Tax Regs.
(Example (8)),[16] states:

---

[16]Example (8) applies to the discharge of indebtedness that
is recourse in nature.  While the parties did not expressly
stipulate that petitioners' loan to finance the purchase of the
Yantari constituted recourse debt, we infer from certain other
stipulations of the parties that that loan was recourse debt.
The parties stipulated that the foreclosure sale resulted in both
DOI income and capital gain, although petitioners dispute whether
they must recognize that DOI income.  DOI income and capital gain
(continued...)

In 1980, F transfers to a creditor an asset with a fair market value of $6,000 and the creditor discharges $7,500 of indebtedness for which F is personally liable. The amount realized on the disposition of the asset is its fair market value ($6,000). In addition, F has income from the discharge of indebtedness of $1,500 ($7,500 - $6,000).

Example 8 is controlling in the instant case. As a result of the foreclosure sale, the bank discharged a total of $137,142 of indebtedness for which petitioners were liable, $95,000 of which it received on the disposition of the Yantari at that foreclosure sale. The amount realized on the disposition of the Yantari is its fair market value which, on the record presented, we have found to be the sale price of the Yantari at the foreclosure sale. See Frazier v. Commissioner, supra at 246; Community Bank v. Commissioner, supra at 792. In addition, petitioners have income from the discharge of indebtedness in the amount of $42,142 ($137,142, the unpaid principal balance of the loan at the time of the foreclosure sale, minus $95,000, the fair market value of the Yantari at that sale).

On the record before us, we find that, in the event the computations under Rule 155 establish that there is an understatement of tax as a result of our holdings and the parties' concessions in this case that is greater than 10 percent of the

---

[16](...continued) would result from the foreclosure sale only if petitioners' debt were recourse debt. See Frazier v. Commissioner, 111 T.C. 243, 245, 247 (1998); sec. 1.1001-2(a)(1) and (2) and 2(c), Example (8), Income Tax Regs.

tax required to be shown in petitioners' joint return or $5,000, see sec. 6662(d)(1)(A), petitioners have failed to establish there is no substantial understatement of tax under section 6662(b)(2) and (d).

We turn now to respondent's determination under section 6662(a) and (b)(1). For the reasons set forth above explaining why we found that petitioners failed to show that they had a reasonable basis for their position in petitioners' joint return regarding petitioners' capital gain, we find on the record before us that petitioners have failed to show that, in not reporting that gain, (1) they made a reasonable attempt to comply with, and did not intentionally disregard, section 1001 and the regulations thereunder, including Example 8, Frazier v. Commissioner, supra, and Community Bank v. Commissioner, supra, and (2) they acted with due care and did what a reasonable person would do under the circumstances. We further find on that record that petitioners have failed to establish that they were not negligent in failing to report that gain in that return.

On the instant record, we also find that petitioners have failed to show that they acted with reasonable cause and in good faith with respect to the portion of the underpayment of tax for 1993 that is attributable to petitioners' capital gain. See sec. 6664(c).

Based on our examination of the entire record before us, we

find that petitioners have failed to establish any error in respondent's determination that they are liable for the year at issue for the accuracy-related penalty under section 6662(a) insofar as it relates to the underpayment of tax attributable to petitioners' capital gain.  Consequently, we sustain that determination to that extent.

We have considered all of the contentions and arguments of petitioners that are not discussed herein, and we find them to be without merit and/or irrelevant.

To reflect the foregoing and the concessions of the parties,

Decision will be entered under

Rule 155.